**BERTOLINI, Appellant,**

v.

**WHITEHALL CITY SCHOOL DISTRICT BOARD OF EDUCATION, Appellee.**

[Cite as *Bertolini v. Whitehall City School Dist.*
*Bd. of Edn.* (2000), 139 Ohio App.3d 595.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 99AP–1374.

Decided Sept. 26, 2000.

596

*Shayne & Greenwald Co., L.P.A., Hilary R. Damaser* and *Donnell R. Grubbs,* for appellant.

*Horning & Horning, L.P.A., Richard A. Horning* and J. *David Horning,* for appellee.

BROWN, Judge.

Joseph L. Bertolini, appellant, appeals a judgment of the Franklin County Court of Common Pleas, Civil Division. The trial court affirmed a decision of the Whitehall City School District Board of Education, appellee, terminating appellant as associate superintendent for Whitehall City Schools. We reverse and remand.

In May 1997, appellant was hired by the Whitehall City School District Board of Education ("board") to be the associate superintendent for Whitehall City Schools ("Whitehall"). Appellant previously held the position of superintendent of the Leetonia School District ("Leetonia"). While working at Leetonia, appellant became acquainted with Patti Woods, who was also employed by Leetonia. Even though appellant and Woods were married to other individuals, from July 1997 to November 1997, the two began a sexual relationship. After the board hired appellant, Woods applied for the position of secretary to appellant. She was interviewed by several individuals but was not interviewed by appellant. The individuals responsible for hiring determined that Woods was overqualified to be a secretary, so she was offered the position of EMIS coordinator with Whitehall. As EMIS coordinator, Woods's supervisor was Donald Moore. Moore's supervisor was appellant. Woods moved to Columbus, but her husband remained in Columbiana County. Woods and her husband later divorced.

Woods stated in a hearing held before a referee that she had a good relationship with appellant and his family when she first began working for Whitehall. Woods had a key to appellant's home and took appellant's daughter home from school. Appellant had a key to Woods's condominium. Woods testified that around November 3, 1997, she attempted to end the romantic relationship with appellant but desired to remain good friends. Woods agreed with the statement that her "relationship with [appellant] and his family continued to be fairly close after [their] physical relationship ceased, at least for a period of time." On November 9, 1997, shortly after Woods ended the romantic

relationship with appellant, a conference was held for Ohio school superintendents and school board members. At the conference, appellant was required to assist Dr. James Crawford, the superintendent of Whitehall. However, appellant became drunk the first night and failed to attend the remainder of the conference.

Appellant's performance as an associate superintendent was later evaluated by Dr. Crawford. The results of Dr. Crawford's evaluation were expressed in a letter to appellant dated January 5, 1998, which stated:

"Let me begin by stating how pleased I am to have you as a member of our administrative team. You certainly join our district with much expertise in the area of school administration. Some of your administrative skills that have impressed me the most at this point are:

"• *Your knowledge of how to handle potential, volatile situations, particularly in processing complaints from parents and/or staff members.* You have always addressed these situations in a very professional, very appropriate, and very fair manner. In the future, I hope you will continue to handle *all* situations as successful as you have up to this point.

"• *Your strength in the area of school/community relations.* Although, as we addressed when you first came to Whitehall that your role and responsibilities were primarily <u>not</u> in this area, I must tell you that I am impressed at the amount of district sporting events and other social events that you have attended on your own and the relationships that you have built with community members. It is certainly a strong statement of your desire to serve this community and school district to the best of your ability. Keep up the good work!

"• *You seemed to have developed a good working relationship with the WEA in spite of this being a very difficult area.* I see the role of the associate superintendent being a buffer between the association and the superintendent, thus making this an area of consistent challenge. Maintaining your loyalties to the superintendent and still maintaining a good working relationship with the WEA is many times like walking a tightrope, but this is an area in which you seem extremely comfortable and confident. I hope you continue processing and working closely with the WEA and at the same time maintaining the direction and maneuverability that I have designed as our approach for management of the school district.

"In most evaluations, there are always some areas of concern; however, at this particular time, I do not see any area in which I have a concern.

"I hope you continue to blend into the community and school district, working through the day-to-day situations (as you have done so very well up to this point).

I am looking forward to a long working relationship with you not only as superintendent/associate superintendent, but also as your friend.

"I would hope that you accept this evaluation as nothing less than a report of *outstanding performance as associate superintendent of the Whitehall City Schools.* Thank you for all your hard work and efforts." (Emphasis added.)

Even though their romantic relationship ended in November 1997, appellant continued to stay in contact with Woods by sending her e-mail messages through Whitehall's computer system. Woods testified that most of the e-mails she received from appellant concerned employment positions for Woods with other school districts. Woods also stated that she felt that appellant was sending the e-mails about the positions as an excuse to contact her because it "was like an outside way of getting me to read the E-mails, getting me to communicate with him." Some of appellant's e-mails to Woods included references to their prior romantic relationship. Woods made copies of nineteen e-mails appellant sent her from January 6, 1998 to February 6, 1998. Woods added that she found the e-mails "[o]ffensive, agitating" because she was "trying to get as far away from any type of personal relationship." Appellant sometimes visited Woods at her office and at her condominium. In February 1998, Woods told appellant that his e-mails were driving her crazy and to "back off." When asked at the hearing before the referee whether appellant's e-mails were causing her "problems at work," Woods answered "[n]o." Woods also stated that Whitehall did not have a policy against receiving personal e-mails. Woods also agreed with the statement that she "never thought [she] was being sexually harassed by [appellant], but she thought that he was pestering [her]."

On February 20, 1998, Moore resigned from his position with Whitehall and appellant was temporarily given Moore's duties. The change also meant that appellant would be Woods's direct supervisor. That day, Woods asked if she could be placed under a different supervisor. Woods testified that she wanted the change because "I didn't want my career or my future to be at stake based on his relations or his reviews" and "there had been some instances in which I was uncomfortable working with [appellant] in the recent past."

On February 21, 1998, Woods met with Dr. Crawford and told him about her relationship with appellant. Woods provided copies of e-mail messages from appellant and played phone messages from her home answering machine left by appellant. A letter dated February·21, 1998, from Dr. Crawford to appellant stated:

"Sexual harassment complaints have been issued against you by EMIS secretary, Patti Woods. You are hereby notified that you are suspended with pay, pending the investigation of these complaints.

"Furthermore, you are directed not to be on any Whitehall City Schools property, in any Whitehall City School facility, or attend any function sponsored by Whitehall City Schools during this investigation."

In a letter dated February 26, 1998, addressed to Michael Capoziello, president of the board, Dr. Crawford stated:

"On February 21, 1998, I received a complaint from employee Patti Woods alleging sexual harassment and other inappropriate actions by [appellant]. After investigating that complaint, including the personal interview with Ms. Woods and a review of electronic mail which she had received from Mr. Bertolini, as well as tape recordings from her telephone message machine, I must recommend the immediate termination of [appellant's] contract. Unfortunately, much of his past ineffectiveness can now be attributed to what has transpired in regard to Ms. Woods since [appellant] began employment with the District. He has been ineffective as an administrator and then failed to address serious deficiencies which I previously reviewed with him in conferences.

"As a result of my investigation, I believe [appellant] should be terminated due to gross inefficiency, immorality, willful and persistent violations of reasonable regulations of the Board of Education and other good and just cause, including but not limited to: failure to address serious deficiencies; fomenting employee dissatisfactions; insubordination with respect to superiors; inattentiveness to directives of the Superintendent; excessive absence from the building and responsibilities; unprofessional electronic communication; sexual harassment of an employee; stalking of an employee; creating a hostile work environment for an employee; suggesting a *quid pro quo* relationship with an employee; abuse and misuse of school property and facilities via electronic mail transmission; inappropriate disclosure of District business; dishonesty; and excessive use of professional time for personal matters.

"While I continue to investigate, it is clear that I must request that you place a resolution on the agenda for the Board meeting of March 12, 1998, to act appropriately on my recommendation of termination of [appellant's] contract."

On March 12, 1998, the board voted to terminate appellant's contract.

On March 2, 1998, Woods gave Whitehall notice that she was resigning from her position. Woods had interviewed for a position with the Metropolitan Education Council ("MEC") before February 20, 1998, and she was awarded a position with MEC on March 2, 1998. Woods testified that the position with MEC was "more in my field of expertise" and had a higher salary than her position with Whitehall.

In June 1998, a referee held hearings in which evidence was presented by the parties concerning whether appellant's termination was proper. The referee, in a

fourteen-page opinion that included forty-six findings of fact and six conclusions of law, recommended that appellant "be paid his full salary for the full period of suspension * * * [and] that the charges and the record of the hearing be physically expunged from the minutes of the board." On October 14, 1998, the board rejected the referee's recommendations and voted to terminate appellant's contract "for the grounds of gross inefficiency, immorality, willful and persistent violation of reasonable regulations of the Board and for other good and just cause, as of February 21, 1998." The board accepted most of the referee's findings of fact but rejected or modified some of the referee's key factual determinations.

On November 6, 1998, appellant filed a complaint with the Franklin County Court of Common Pleas pursuant to R.C. 3319.16. In the complaint, appellant disputed many of the board's findings and requested the court to enter an order (1) reversing the board's termination of his contract, (2) reinstating him to his position with Whitehall with full back pay and benefits, and (3) "that the charges and the record of the hearing before the Referee be physically expunged from the minutes of the Board."

On November 4, 1999, the trial court held that the "totality of the circumstances in this case and the aggregate of Appellant's conduct constitute serious enough matters to justify the termination for immorality and other good and just cause." Appellant appeals this decision and presents the following assignment of error:

"In affirming the School Board's decision and resolution, the Court of Common Pleas abused its discretion by failing to give the appropriate deference to the statutory Referee's findings of fact, which were supported by the greater weight, or preponderance, of the evidence."

In his assignment of error, appellant argues that the trial court should have reversed the board's resolution because it was not supported by a preponderance of the evidence. Appellant claims that the "court below abused its discretion by simply affirming the Board's resolution without challenging its misinterpretation and misuse of the facts as determined by the Referee." The trial court found that appellant's termination was proper because appellant's conduct was (1) immoral and (2) constituted willful and persistent violation of Whitehall's policies. We will discuss each of the bases the trial court relied upon in its opinion in the order they have been presented.

R.C. 3319.16 states:

"The contract of any teacher employed by the board of education of any city, exempted village, local, county, or joint vocational school district may not be terminated except for gross inefficiency or immorality; for willful and persistent

violations of reasonable regulations of the board of education; or for other good and just cause. * * * [T]he teacher may file with the treasurer a written demand for a hearing before the board or before a referee * * *. * * * The hearing shall be conducted by a referee appointed pursuant to section 3319.161 of the Revised Code, if demanded[.]

"* * *

"After a hearing by a referee, the referee shall file his report within ten days after the termination of the hearing. After consideration of the referee's report, the board, by a majority vote, may accept or reject the referee's recommendation on the termination of the teacher's contract. After a hearing by the board, the board, by majority vote, may enter its determination upon its minutes. Any order of termination of a contract shall state the grounds for termination. If the decision, after hearing, is against termination of the contract, the charges and the record of the hearing shall be physically expunged from the minutes, and, if the teacher has suffered any loss of salary by reason of being suspended, he shall be paid his full salary for the period of such suspension."

The procedures for termination of a teacher's contract apply to appellant because the definition of a teacher pursuant to R.C. 3319.08 to 3319.18 includes persons employed in Ohio public schools as superintendents. R.C. 3319.09(A).

■ In teacher-contract termination disputes arising under R.C. 3319.16, a referee's findings of fact must be accepted unless such findings are against the greater weight or preponderance of the evidence. *Aldridge v. Huntington Local School Dist. Bd. of Edn.* (1988), 38 Ohio St.3d 154, 527 N.E.2d 291, syllabus. "The decision to terminate a teacher's contract is comprised of two parts: (1) the factual basis for the allegations giving rise to the termination; and (2) the judgment as to whether the facts, as found, constitute gross inefficiency, immorality, or good cause as defined by statute." *Id.* at 157, 527 N.E.2d at 294. "[D]ue deference must be accorded to the findings and recommendations of the referee * * * who is best able to observe the demeanor of the witnesses and weigh their credibility." *Graziano v. Amherst Exempted Village Bd. of Edn.* (1987), 32 Ohio St.3d 289, 293, 513 N.E.2d 282, 285.

■ A school board has the discretion to accept or reject the recommendation of the referee unless such acceptance or rejection is contrary to law. *Aldridge,* syllabus. The reason why a referee is required is because the legislature intended to "inject a neutral party into termination disputes." *Aldridge* at 157, 527 N.E.2d at 294. "The referee's primary duty is to ascertain facts. The board's primary duty is to interpret the significance of the facts." *Aldridge* at 158, 527 N.E.2d at 294.

Concerning the role of a court of common pleas, R.C. 3319.16 states:

"Any teacher affected by an order of termination of contract may appeal to the court of common pleas of the county in which the school is located within thirty days after receipt of notice of the entry of such order. The appeal shall be an original action in the court and shall be commenced by the filing of a complaint against the board, in which complaint the facts shall be alleged upon which the teacher relies for a reversal or modification of such order of termination of contract. * * * The court shall examine the transcript and record of the hearing and shall hold such additional hearings as it considers advisable, at which it may consider other evidence in addition to the transcript and record.

"Upon final hearing, the court shall grant or deny the relief prayed for in the complaint as may be proper in accordance with the evidence adduced in the hearing. Such an action is a special proceeding, and either the teacher or the board may appeal from the decision of the court of common pleas pursuant to the Rules of Appellate Procedure and, to the extent not in conflict with those rules, Chapter 2505. of the Revised Code."

■ Absent a claim that the school board violated a statutory right or constitutional obligation, a trial court may not substitute its judgment for that of the board. *Strohm v. Reynoldsburg City School Dist. Bd. of Edn.* (Mar. 31, 1998), Franklin App. No. 97APE07–972, unreported, 1998 WL 151082. "If substantial and credible evidence is presented to support the charges of the board, and a fair administrative hearing is had, the reviewing court cannot substitute its judgment for the judgment of the administrative authorities." *Id.* The scope of review of the court of appeals is limited to whether the common pleas court abused its discretion. *Buie v. Chippewa Local School Dist. Bd. of Edn.* (Sept. 13, 1995), Wayne App. No. 2924, unreported, 1995 WL 542217, discretionary appeal not allowed (1996), 74 Ohio St.3d 1525, 660 N.E.2d 744.

■ The trial court upheld the board's decision to terminate appellant's contract, in part, based upon the finding that appellant's actions constituted serious immorality and were supported by a preponderance of the evidence. In support of this conclusion, the court held that appellant "prevailed upon Dr. Crawford to hire Patti Woods after he had begun a sexual relationship with her, clearly so that he could continue it more conveniently by having her in the same city and school system." However, the referee made a finding of fact that "Patti Woods was hired by the Whitehall City School System because of her qualifications, and not because of any relationship with [appellant]." The referee's finding was supported by the record and, therefore, the trial court should have deferred to this finding of fact of the referee.

■ The court also held that since appellant and Woods were both married when the affair began, "[h]is actions were clearly immoral." While an

adulterous affair may be considered immoral, in "order to constitute 'immorality' * * * as it relates to the termination of a teacher's contract, the conduct complained of must be hostile to the school community and cannot be some private act which has no impact on the teacher's professional duties." *Florian v. Highland Local Bd. of Edn.* (1983), 24 Ohio App.3d 41, 493 N.E.2d 249, syllabus. Therefore, an adulterous affair by a teacher without evidence to establish that it created hostility in the (school) community or that it had a serious impact on the teacher's professional duties is not a valid reason for termination.[1]

A review of the record shows that many individuals testified concerning the effectiveness of appellant as an associate superintendent. As noted by the trial court, on January 5, 1998, Dr. Crawford wrote a "glowing evaluation" of appellant's performance as an associate superintendent. Dr. Crawford stated in his evaluation that "I would hope that you accept this evaluation as nothing less than a report of *outstanding performance as associate superintendent of the Whitehall City Schools.*" (Emphasis *sic.*) The trial court also found that the board incorrectly held that appellant was grossly inefficient. Additionally, a review of all of the evidence presented against appellant shows that insufficient evidence was presented to establish that appellant's relationship with Woods was hostile to the community or that it had a serious impact on either of their professional duties.

In support of its finding that appellant's conduct was immoral and sufficient for his termination, the court also stated that (1) there was a negative perception in the school district about his lunches with Woods, (2) there were rumors of an affair according to several witnesses, and (3) appellant's affair with Woods "[c]learly * * * [does not render him as] * * * the type of role model parents want their children to have" because appellant "should be expected to lead both teachers and students by example." A review of the referee's findings of fact shows that no facts were cited by the referee to support a finding that appellant's actions had a negative impact on the school community. Even if evidence was

---

1. We also note that the court in *Florian* stated that in order to constitute immorality, the conduct could not be a private act with *no* impact on the teacher's professional duties. This would seem to indicate that a showing that a private act has had *some* impact on a teacher's professional duties would be sufficient to justify a termination. However, when considering the procedural protections afforded by R.C. 3319.16, we believe that the evidence must instead show that the private act had a *serious* impact on the teacher's professional duties. For example, evidence that a teacher is guilty of a simple traffic violation while not within the scope of his or her employment should not be sufficient evidence of an "immoral" private act to justify a termination of the teacher's contract. However, a teacher who engaged in a high speed chase down a major city street in an attempt to avoid apprehension from police while detaining a fifteen-year-old in his automobile against his will can constitute immorality and other good and just cause for the teacher's contract to be terminated. *Ricchetti v. Cleveland City School Dist. Bd. of Edn.* (Mar. 3, 1994), Cuyahoga App. No. 64833, unreported, 1994 WL 66227, appeal dismissed (1995), 72 Ohio St.3d 1214, 650 N.E.2d 109.

shown that appellant's colleagues had a "negative perception" of him because of the "rumors of an affair," this is not sufficient evidence to justify his termination. Additionally, if we were to allow the reasoning that appellant should have been terminated simply because his affair with a colleague made him not "the type of role model parents want their children to have," this would open the door to allow other teachers to be terminated because of race, religion, political beliefs, and/or sexual orientation simply because the teacher was not "the type of role model parents want their children to have." Because of the potential abuse of this standard, we do not believe that this standard should be used.

The trial court also found that the board's decision to terminate appellant's contract was supported by a preponderance of the evidence, finding that appellant's actions constituted willful and persistent violations of school policies. The violations referenced by the trial court were the board's policy regarding sexual harassment and computer use. The section of the board's sexual harassment policy that was applied to the present case was the following:

"Unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature may constitute sexual harassment where:
"* * *

"3. such conduct has the purpose or effect of unreasonably interfering with an individual's work or educational performance or creating an intimidating, hostile or offensive working or educational environment."

The trial court stated, "the Court agrees with the Board that the harassment was offensive and certainly not an isolated event. It went on daily and clearly pervaded [appellant's and Wood's] relationship." However, this statement by the court conflicts with some of the findings of fact by the referee. For example, the referee found:

"Patti Woods also testified that she was never afraid of [appellant]; and that she never thought she was being sexually harassed by [appellant]. Further, she testified that she never considered filing sexual harassment charges against him."

Woods did testify that she thought appellant's actions created an environment that "could be called a hostile environment." However, when asked whether her employment was "ever conditioned upon maintaining that relationship as romantic or sexual," Woods answered "[n]o."

While the trial court was correct in its statement that the referee "was not trying a sexual harassment case, [s]he was trying a wrongful termination case," it is appropriate in the present case to look at the standard for a hostile work environment as set forth by the United States Supreme Court in *Faragher v. Boca Raton* (1998), 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662. In order to

determine whether the work environment was sufficiently hostile, the court looks at all of the circumstances, including the " 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Id.* at 787–788, 118 S.Ct. at 2283, 141 L.Ed.2d 662, 676, quoting *Harris v. Forklift Sys., Inc.* (1993), 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295, 302–303. The reason why this standard should be followed is "to ensure that courts and juries do not mistake ordinary socializing in the workplace * * * for discriminatory 'conditions of employment.' " *Oncale v. Sundowner Offshore Serv., Inc.* (1998), 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201, 208. A review of all of the evidence shows that even though appellant's actions towards Woods were inappropriate and made her feel uncomfortable, they did not rise to the level of creating a hostile work environment sufficient to justify appellant's termination based upon the board's sexual harassment policy.

■ The board's computer-use policy included a requirement that e-mail be used "in a responsible, efficient, ethical and legal manner." Unacceptable uses include "language which may be offensive to another user." The court found that the non-reciprocal nature of appellant's e-mails to Woods about personal matters "amounts to at least offensive if not harassing conduct." However, Woods testified that appellant's actions did not affect her work and that she was able to ignore them. Appellant stopped sending e-mail messages to Woods several weeks before she talked to Dr. Crawford about his actions toward her. Evidence was also presented that the board's policy allowed personal e-mail messages and that others in the administration used the school's e-mail system for purposes that were not solely work-related. No evidence was presented that appellant was ever told to stop using the e-mail system in a harassing manner before February 21, 1998, or that he continued to use the e-mail system in an unauthorized manner after being so advised.

Accordingly, after a complete review of the record, which includes the exhibits introduced at appellant's hearing, the transcripts of that hearing, the findings of fact and conclusions of law of the referee, and the board's resolution to terminate appellant's contract, we find that the trial court abused its discretion in holding that "[a]ppellant's conduct constituted serious enough matters to justify the termination for immorality and other good and just cause." We agree with the referee's detailed analysis of the evidence and conclusions that the board "failed to prove by a preponderance of the evidence that [appellant] was guilty of immorality" and that appellant "was guilty of willful and persistent violations of reasonable regulations."

We note that the present case should also be viewed against other cases involving teachers and supervisors who appeal their contract terminations pursuant to R.C. 3319.16. A review of cases in which the appellate court affirmed a school board's decision to terminate a school employee shows that the teacher's behavior had or could have had a serious effect on the school system. For example, many of the cases involved inappropriate sexual relations between faculty and students.[2] Other cases involved instances in which a teacher had been convicted of a serious criminal offense.[3] Some of the cases involved direct refusals by teachers to follow board guidelines.[4] In other cases, the actions of a teacher could have caused serious harm to a student.[5] In the present case, appellant's actions did not involve any students. Appellant was not convicted of a criminal offense, and his actions were not harmful to any students. The only evidence presented of the immorality contemplated by R.C. 3319.16 was the fact

---

**2.** In *Strohm*, the teacher had sexual activity with female students enrolled in the school district and provided alcohol to minor females enrolled in the school district. In *Carothers v. Tri–Valley Local School Dist. Bd. of Edn.* (Mar. 29, 1993), Muskingum App. No. CA–92–21, unreported, 1993 WL 95621, a high school teacher began a relationship with two twin girls who were his students, which relationship led to sexual conduct with one or both of the twin girls. In *Cremeens v. Gallia Cty. Local School Dist. Bd. of Edn.* (Feb. 17, 1993), Gallia App. No. 92CA12, unreported, 1993 WL 49468, jurisdictional motion overruled (1993), 67 Ohio St.3d 1410, 615 N.E.2d 1045, a teacher was accused of sexual advances and touching the breasts of several female students.

**3.** In *Sayers v. State Bd. of Edn.* (Dec. 1, 1994), Cuyahoga App. No. 66578, unreported, 1994 WL 676869, the teacher was a physical education teacher who was fired after a criminal conviction for a sex offense. In *Stelzer v. State Bd. of Edn.* (1991), 72 Ohio App.3d 529, 595 N.E.2d 489, a teacher was fired after being convicted of a felony relating to the continued receipt of stolen property over a five-year period.

**4.** In *Buie*, the teacher resisted making any changes suggested by the school principal over a two-year period to alleviate excessive noise and disorder in his classroom. In *Wynne v. S. Point Local School Dist. Bd. of Edn.* (July 23, 1992), Lawrence App. No. 91CA15, unreported, 1992 WL 174720, a teacher failed to report to work at the expiration of her leave of absence after having been absent from work for twenty months. In *Swinderman v. Dover City School Dist. Bd. of Edn.* (Apr. 20, 1992), Tuscarawas App. No. 91AP110092, unreported, 1992 WL 91655 dismissed (1992), 65 Ohio St.3d 1453, 602 N.E.2d 250, a teacher lied about time taken for sick leave following a trip during Christmas break to Arizona with a student. In *Thomas v. Columbus Pub. Schools* (Feb. 12, 1991), Franklin App. No. 90AP–649, unreported, 1991 WL 19301, the teacher refused to follow a program established by the board and refused to cooperate to the point that the teacher threw a consultant out of his classroom.

**5.** In *Ricchetti*, a teacher engaged in a high-speed chase down a major city street in an attempt to avoid apprehension from police while detaining a fifteen-year-old male in his automobile against his will. In *Brownfield v. Warren Local School Dist. Bd. of Edn.* (Aug. 28, 1990), Washington App. No. 89CA26, unreported, 1990 WL 127054, jurisdictional motion overruled (1991), 57 Ohio St.3d 711, 568 N.E.2d 697, a science teacher risked the physical safety of a student by requiring the student to touch the end of a paper clip placed into one of the holes of a 110-volt electrical outlet.

that appellant was initially dishonest with Dr. Crawford when he denied having an affair with Woods when he was first asked about it prior to February 21, 1998.

Additionally, a review of cases where an appellate court has reversed the decision of a board to terminate a teacher helps to illustrate the severity of the conduct needed to justify a termination pursuant to R.C. 3319.16. In *James v. Trumbull Cty. Bd. of Edn.* (1995), 105 Ohio App.3d 392, 663 N.E.2d 1361, the board's decision to terminate a teacher for employing controversial teaching techniques to handicapped children was reversed because the appellate court found that the evidence did not support the board's decision. The appellate court agreed with the trial court's findings that the board failed to produce any written or verbal policy allegedly violated by the teacher, or cite a single directive or instruction not followed by the teacher. *Id.* at 397, 663 N.E.2d at 1364. The trial court also found that after the board raised its concerns with the teacher, the teacher "was never given the opportunity to conform her behavior to [the board's] expectations." *Id.*

In *Cephus v. Dayton Bd. of Edn.* (Oct. 27, 1993), Montgomery App. No. 13884, unreported, 1993 WL 435583, jurisdictional motion overruled (1994), 69 Ohio St.3d 1410, 629 N.E.2d 1371, the appellate court reversed a board's decision to terminate a teacher because the teacher failed to take a mental examination. The appellate court found that the teacher's request that the instructions for the mental examination be put in writing was reasonable. The appellate court also noted that had the teacher "received the written instructions of January 16, 1992 and not complied with the requests contained therein, then clearly the Board would have been justified in terminating her."

In *Katz v. Maple Hts. City School Dist. Bd. of Edn.* (1993), 87 Ohio App.3d 256, 622 N.E.2d 1, the appellate court found the board's decision to terminate a teacher for falsifying sick time was not sufficient evidence for termination. The appellate court found that the superintendent "did not even consider the [teacher's] employment record prior to recommending to the board that [the teacher] should be terminated." *Id.* at 262, 622 N.E.2d at 5. The appellate court concluded:

"[T]he record reveals that appellant was an effective teacher, was well respected, had no prior disciplinary infractions, and was under severe emotional pressure at the time of the offense, yet the board imposed the most severe sanction when it terminated the appellant's teaching contract." *Id.* at 263, 622 N.E.2d at 5.

These three cases are very illustrative of the present case. The board, in order to justify its decision to terminate appellant, attempted to "pigeon-hole" appellant's actions into supposed violations of rules and regulations in an attempt to justify their decision to terminate appellant. Additionally, the board never gave appellant an opportunity to change the behavior the board found so objectionable

to warrant termination (although we note that such an opportunity may not be required in all cases). The record instead shows that after Woods talked to Dr. Crawford, appellant acquiesced to all requests made by Dr. Crawford and the board, except for Dr. Crawford's request on February 21, 1998, that appellant (1) resign his position effective May 1, 1998, or (2) sign a letter acknowledging his immediate suspension with pay. The record also shows that immediately after learning about appellant's affair with Woods, Dr. Crawford sought for appellant's resignation or termination. Additionally, a review of Dr. Crawford's evaluation of appellant dated January 5, 1998, also shows that appellant's past performance, as an associate superintendent of Whitehall Schools was not sufficiently considered.

Accordingly, we sustain appellant's assignment of error. The judgment of the Franklin County Court of Common Pleas is reversed, and we remand this cause to that court pursuant to R.C. 3319.16, to grant the relief prayed for in appellant's complaint as the trial court may find proper and, which is in accordance with our opinion and the record.

*Judgment reversed
and cause remanded.*

TYACK and PETREE, JJ., concur.