Pfeifer, J.,
dissenting.
I
{¶ 103} To the end, John Freshwater has been a teacher. For more than five years, he has argued that the school board had no right to require him to remove his Bible from his desk. Five years of hearings and appeals have passed, over $900,000 in legal fees reportedly were expended by the school board on the hearing alone in its quest to fire its best eighth-grade science teacher, and the *494 only holding of consequence by this court today echoes what John Freshwater told a gathering of supporters in Mount Vernon’s town square on April 16, 2008:
Because the Bible is * * * personal and private property and the source of personal inner strength in my own life, the removal of it from my desk would be nothing short of infringement on my own deeply held personal religious beliefs, granted by God and guaranteed under the Free Exercise Clause of the First Amendment in the United States Constitution.
{¶ 104} This court has determined today that Freshwater was right. The central piece of the insubordination claim against Freshwater — that he refused to remove his Bible from his desk — has been determined by this court (by the three members of the court that concur in the lead opinion and by at least one other justice, myself) to be an invalid cause for discipline.
{¶ 105} What next? With the insubordination claim gutted, the lead opinion should have moved on to consider the constitutional issues remaining in the case. Instead, the majority walks away from the opportunity to provide helpful guidance to every school board in Ohio and to the thousands of great teachers who could benefit from knowing more about the extent of and limits on their academic freedom. Justice O’Donnell’s well-reasoned dissent addresses the issue, but goes unrebutted. In short, the majority shrinks from the chance to be a Supreme Court. The lead opinion cobbles together the piddling other claims of supposed insubordination, and, sitting as Supreme School Board, the majority declares the matter closed. In a case bounding with arrogance and cowardice, the lead opinion fits right in.

The Desk Bible Was the Center of the Insubordination Claim

{¶ 106} Since Freshwater became aware of possible discipline, the presence of the Bible on his desk was a bone of contention. The April 7, 2008 letter from Principal William White to Freshwater was to follow up with Freshwater regarding concerns about Freshwater’s role with the Fellowship of Christian Athletes (“FCA”) and about “religious materials in [his] classroom.” The letter mentioned only the Bible on his desk and the Ten Commandments on Freshwater’s classroom window as potentially offensive:
With regard to religious materials in your classroom, it has been brought to my attention that you have a bible out on your desk and that the “collage” on your classroom window includes the 10 commandments. While you certainly may read your bible on your own, duty free time [i.e. during lunch], it cannot be sitting out on your desk when students are in *495 the classroom and when you are supposed to be engaged in your responsibilities as a teacher. As for the 10 commandments, that part of your collage must be taken down and replaced with something that is not religious in nature.
{¶ 107} A letter from White to Freshwater on April 14 — before Freshwater had checked out books from the-library — memorializes an April 11 conversation between White and Freshwater regarding religious items in Freshwater’s classroom:
As per our conversation, all religious items need to be removed from your classroom by the end of the day on Wednesday, April 16, 2008. Bibles and other religious DVD’s, videos, etc. should be placed out of sight and access of students by this date.
{¶ 108} In the letter from their attorneys dated April 14, 2008, Stephen and Jenifer Dennis, the parents of Zaeh Dennis, the now adult who was the eighth-grade student at the heart of this case, outlined their own bill of particulars stating why Freshwater’s career must end:
The Ten Commandments are displayed in Mr. Freshwater’s classroom. Several Bibles are also kept in Mr. Freshwater’s classroom and are there as a display to his students, not for his personal use. This display represents an ostensible and predominant purpose of advancing religion and violates the central Establishment Clause virtue of official religious neutrality.
{¶ 109} In a letter from their attorney to Superintendent Stephen Short dated April 21, 2008, the hypervigilant Dennises apparently were satisfied that the religious-display issue had been cleared up, and moved on to other matters: ‘While we appreciate Mt. Vernon’s efforts to have Mr. Freshwater remove religious materials from his classroom, it is obvious that Mr. Freshwater has not ceased his religious teachings.”
{¶ 110} On April 16, 2008, Freshwater and White came to a crystal clear understanding: If Freshwater did not remove his personal Bible from his desk in his classroom, he would be considered insubordinate. That conclusion was specific and undeniable. Only one thing was necessary for Freshwater to be found insubordinate — that his personal Bible remain on his desk. Freshwater *496 could not abide any directive to remove it. He so fervently believed his rectitude that he went public, literally entering the public square to air his grievance.
{11111}Ina story in the April 18, 2008 Mansfield News Journal entered into evidence by Freshwater, Mount Vernon School Board president Ian Watson spoke about insubordination, mentioning only Freshwater’s Bible:
“If he doesn’t remove the Bible from his desktop, at some point, and I don’t know that point yet because we haven’t progressed that far, but some claim of insubordination could be made,” Watson said. “There would be penalties involved, which would vary depending on the level of insubordination.”
Kinton, Mount Vernon School Officials Hope to Resolve Bible Standoff Quickly, Mansfield News Journal (April 18, 2008). The same article later recounted additional details:
Watson said the Bible on Freshwater’s desk became an issue when one family brought it to Short’s attention.
“The parents expressed concern on what allegedly occurred. Most recently, I spoke to the family at the first of this month,” Watson said. “We would like to see the Bible removed so that we can be responsive to parents, and we would like to reach a common ground with Mr. Freshwater that everyone can be OK with, but I don’t know if that will happen.”
{¶ 112} Over and over again, the Ten Commandments and Freshwater’s personal Bible were the focus of the complaints against Freshwater. There is no dispute that the Ten Commandments were quickly removed from his classroom. The Bible remained the sticking point.

Other Evidence of Insubordination

{¶ 113} The issue of Freshwater’s desktop Bible deserves the attention the lead opinion gives it. The presence of that Bible on his desk was at the very center of the insubordination claim against Freshwater. Now that theory is gone, and less than a fig leaf remains. The lead opinion spends many paragraphs explaining the invalidity of the central reason given for Freshwater’s dismissal, his refusal to remove his Bible from his desk. An unofficial majority of the court agrees with that aspect of the holding, as I consider myself a member of that unofficial majority. But the lead opinion spends just one scant, conclusory ■ paragraph outlining why Freshwater’s career had to end. Now that Freshwater *497 has won on the most important dispute, the myth must be created that the presence of the other items constituted insubordination.

Bush/Powell Poster

{¶ 114} Was there a valid work rule in effect regarding the Bush/Powell poster? The majority cannot be bothered to say whether there was or whether it was willfully disobeyed. Certainly, if there were a rule about the Bush/Powell poster, it did not apply to everyone. As Justice O’Donnell relates in his dissenting opinion, at ¶ 147, the poster was distributed by the school and was displayed in other teachers’ rooms. The picture of the poster in evidence shows that the biblical quote at the top of the poster is largely obscured by other items on Freshwater’s bulletin board. There is no evidence that Freshwater left the Powell/Bush poster up because of its religious nature. He claimed that it was a patriotic poster that appealed to him because he had two children in the military. The president of the school board, Watson, testified that “in and of itself,” the poster was not a religious display. And on April 16, the poster was inconsequential — Freshwater was told he would be insubordinate for failing to remove his Bible. The poster was then what it is today: a trifle.

Library Books

{¶ 115} What work rule or order did Freshwater violate by checking out books from the library? Was there a work rule in effect that a teacher could not borrow books from the school library and keep them in his work area? Does the lead opinion really mean to say that books of a religious nature are acceptable in the library but not acceptable to be checked out from the library? Or is it only practicing Christians who cannot borrow such books from the library? Freshwater is not accused of reading to his class from the books or assigning the books to his students. They were school property and could have been removed at any time. There is no documented complaint about the books and no specific order that they be removed.
{¶ 116} Whether Freshwater checked them out of the library to make a point or to provide himself comfort is irrelevant. There was no work rule or order that he could not have them in his classroom. If he did check them out to make a point, the point was valid: religious materials were present in the school and if they were not forced upon children, possessing them was acceptable. If the placement of the library books, the Oxford Bible and Jesus of Nazareth, was designed to demonstrate defiance, should Freshwater be fired for indicating his resistance to a policy that this court has declared illegal?

A Fairly Serious Matter

{¶ 117} In interpreting the “other good and just cause” clause of the version of R.C. 3319.16 at issue here, this court has made clear that firings implicating that *498 phrase must involve conduct on a par with that justifying termination for other reasons under the statute:
In construing the words, “other good and just cause,” we note that they are used with the words “gross inefficiency or immorality” and “willful and persistent violations” of board regulations. In our opinion, this indicates a legislative intention that the “other good and just cause” be a fairly serious matter.
Hale v. Lancaster Bd. of Edn., 13 Ohio St.2d 92, 98-99, 234 N.E.2d 583 (1968).
{¶ 118} Is the presence of this poster and a couple of library books in his classroom a serious matter on a par with “gross inefficiency or immorality” or “willful and persistent violations” of board regulations? Is this enough to end a career of over 20 years?
{¶ 119} Freshwater’s activities do not sink to the level of other school employees terminated pursuant to R.C. 3319.16. Should Freshwater join the likes of the assistant superintendent in Kitchen v. Bd. of Edn. of Fairfield City School Dist., 12th Dist. Butler No. CA2006-09-234, 2007-Ohio-2846, 2007 WL 1662056, who was fired because of an arrest for drunken driving and her failure to alert her superior about it; the teacher in Oleske v. Hilliard City School Dist. Bd. of Edn., 146 Ohio App.3d 57, 764 N.E.2d 1110 (10th Dist.2001), who was dismissed for telling jokes of a sexual nature to certain of her middle-school students and mocking another teacher in vulgar terms; and the high school teacher in Elsass v. St. Marys City School Dist. Bd. of Edn., 3d Dist. Auglaize No. 2-10-30, 2011-Ohio-1870, 2011 WL 1458154, who was terminated for masturbating in a school parking lot during a school event?
{¶ 120} The court in Bertolini v. Whitehall City School Dist. Bd. of Edn., 139 Ohio App.3d 595, 744 N.E.2d 1245 (10th Dist.2000), reviewed the types of cases meriting R.C. 3316.19 termination:
A review of cases in which the appellate court affirmed a school board’s decision to terminate a school employee shows that the teacher’s behavior had or could have had a serious effect on the school system. For example, many of the cases involved inappropriate sexual relations between faculty and students. Other cases involved instances in which a teacher had been convicted of a serious criminal offense. Some of the cases involved direct refusals by teachers to follow board guidelines. In other cases, the actions of a teacher could have caused serious harm to a student.
*499 (Footnotes omitted.) Id. at 608.
{¶ 121} Bertolini discussed, in particular, cases involving direct refusals by-teachers to follow board guidelines:
In Buie [v. Chippewa Local School Dist. Bd. of Edn., 9th Dist. Wayne No. 2924, 1995 WL 542217 (Sept. 13, 1995)], the teacher resisted making any changes suggested by the school principal over a two-year period to alleviate excessive noise and disorder in his classroom. In Wynne v. S. Point Local School Dist. Bd. of Edn. (July 23, 1992), [4th Dist.] Lawrence App. No. 91CA15, unreported, 1992 WL 174720, a teacher failed to report to work at the expiration of her leave of absence after having been absent from work for twenty months. In Swinderman v. Dover City School Dist. Bd. of Edn. (Apr. 20, 1992), [5th Dist.] Tuscarawas App. No. 91AP110092, unreported, 1992 WL 91655 * * *, a teacher lied about time taken for sick leave following a trip during Christmas break to Arizona with a student. In Thomas v. Columbus Pub. Schools (Feb. 12, 1991), [10th Dist.] Franklin App. No. 90AP-649, unreported, 1991 WL 19301, the teacher refused to follow a program established by the board and refused to cooperate to the point that the teacher threw a consultant out of his classroom.
Id. at fn. 4.
{¶ 122} The remaining instances of so-called insubordination in this case involve no program or official policy of the board of education. Neither the Bush/Powell poster nor the library books had a serious effect on the school system. At worst, they were de minimis violations of an unwritten, ad hoc rule.
{¶ 123} This court’s decision will have far-reaching consequences. In its effort to be rid of Freshwater’s case without too much heavy lifting, this court has set a very low bar for what constitutes “good and just cause.” Precedent from this court regarding R.C. 3319.16 is fairly limited, but now we have a case on the books setting forth that good and just cause means very little cause at all. Teachers throughout the state should feel much less secure in their employment today.
II
{¶ 124} This case illustrates the importance of leadership and the power of hysteria. This case should be a cautionary tale for other school boards, a case study of what not to do. For at least a month before the situation exploded, the *500 Dennises had been complaining about Freshwater, often to the school-board president, Watson, who was a personal acquaintance of Stephen Dennis. Based on those complaints, Freshwater was admonished by a letter dated April 7, 2008, to abide by rules regarding his participation in FCA events and to remove religious displays in his classroom. The situation cried out for leadership by the superintendent, a school-board member, or a prominent community member to bring the sides together and work together toward some understanding. Indeed, a meeting was arranged between the Dennises and Freshwater. The Dennises, however, wished to remain anonymous so that if they canceled the meeting, Freshwater would not know who had lodged complaints against him. According to the Dennises, this was done to protect their son from retaliation. Near the time of the meeting, White revealed to Freshwater the name of the complainant, which upset the Dennises. They canceled the meeting because, according to Mr. Dennis, Freshwater was going to have representation at the meeting and the Dennises were not. Soon enough, the Dennises obtained representation. Within a week, their counsel was demanding Freshwater’s removal from the classroom. Fire him or face a lawsuit, the Dennises said. Bullies are not relegated to playgrounds.
{¶ 125} On April 16, Freshwater made his appearance on the square in Mt. Vernon. The Board of Education responded with a press release announcing many of the claims that the Dennises had raised against Freshwater. And then the headlines started. One headline, accompanied by an article on page A1 of the Columbus Dispatch on April 23, 2008, proclaimed: “DISPUTE WITH MOUNT VERNON TEACHER; Religious ‘healing,’ branding charged.” The circus came to Mount Vernon.
{¶ 126} Hurriedly, an investigation was started. Counsel was retained by the school. Counsel then retained a “mom and pop” human-resources investigation firm, which used a tiny rear-view mirror to review a man’s 20-year career. Hired to find evidence to fire Freshwater, the investigator did just that. Based on the report (the board’s lawyer reviewed earlier drafts), the board announced its intention to fire Freshwater.
{¶ 127} Meanwhile, the Dennises, deciding that the end of Freshwater’s career was insufficient, filed suit in federal court. That Tesla-coil mark on poor Zach’s arm — the one Freshwater claimed was an X and they claimed was a cross— started looking an awful lot like a dollar sign. Eventually, the suit against Freshwater would be settled for $475,000, which included $300,000 for the Dennis parents, $25,000 for their lawyer, and a $150,000 annuity that will end up paying Zach around $217,000 by the time he is 30. The suit against the school district settled for less: in that case, each parent received $1, Zach $5,500, and their lawyers $115,500. Money was a wonderful salve for Zach’s injured arm, which, *501 after all, had suffered a mark on it that disappeared in three weeks. It had kept him from sleeping for a few minutes the night it happened. But now, all is well. His mother, Jenifer, was quoted in a magazine article, Boston, Insidious Design: At the Ohio Supreme Court, a Teacher Claims an “Academic Freedom” Right to Push Creationism in Public School, Church & State (Nov. 2012) 4, available at https://www.au.org/church-state/november-2012-chureh-state/featured/insidiousdesign (accessed Nov. 4, 2013), in 2012:
“Although Mount Vernon has many positive attributes and we still spend time there,” Jenifer Dennis said, “we are extremely fortunate to have found a warm and welcoming community in an adjacent county that we’ve now become a part of. It is a community that is accepting of all ideas, thoughts and people from all walks of life and our family is now a part of it, so we haven’t thought about moving back to Mount Vernon.”
{¶ 128} How special.
{¶ 129} R. Lee Shepherd was hired to conduct the hearing Freshwater demanded; Freshwater had preferred that the board hear it directly, but that request was denied. And so Shepherd conducted the hearing sporadically for two years, taking evidence. On January 7, 2011, he announced his findings. He concluded that none of the grounds individually was enough to cause Freshwater’s ouster: “It is not herein determined whether any one of the bases/grounds for consideration of termination would be sufficient in and of itself. However, the multiple incidents which give rise to the numerous and various bases/grounds more than suffice in support of termination.”
{¶ 130} Despite relying on only one ground for Freshwater’s termination, the lead opinion does not suffer from Shepherd’s finding that only a combination of grounds could lead to his termination, because the school board’s resolution slickly states that each action, whether individually or jointly, constituted good and just cause for termination.
{¶ 131} Shepherd concluded that “Freshwater refused and/or failed to employ objectivity in his instruction of a variety of science subjects and, in so doing, endorsed a particular religious doctrine. By this course of conduct John Freshwater repeatedly violated the Establishment Clause.”
{¶ 132} This conclusion of constitutional significance has gone unexamined by every reviewing court. Each reviewing court has instead remarked how very, very large the record is. Judge Eyster’s two-page rubber stamp of the termination noted that “[t]he referee presided over thirty-eight (38) days of witness testimony from over eighty (80) witnesses generating six thousand three hundred *502 forty four (6,344) pages of transcript. The Referee also admitted approximately three hundred fifty (350) exhibits into evidence.” What followed in the trial court’s entry was exactly zero (0) analysis of the referee’s report upon which the board based its termination resolution.
{¶ 133} The appellate court stated that “[a] review of the record shows that a hearing spanning nearly two years was conducted, testimony from over 80 witnesses was received, a transcript of over 6,000 pages was produced, and approximately 350 exhibits were admitted into evidence.” 2012-Ohio-889, 2012 WL 714392, at ¶ 31. The appellate court found merely that the trial court had not abused its discretion in affirming the board. Id. at ¶ 34.
{¶ 134} Here, the lead opinion, at ¶ 9, adds, “After the hearing, which involved 38 different days of witness testimony spread out over almost 21 months, included more than 80 witnesses and hundreds of exhibits, and ultimately resulted in over 6,000 pages of transcript, the referee issued a report on January 7, 2011.” With a record that large, how could an R.C. 3319.16 referee be wrong about the Establishment Clause?
{¶ 135} How many of those 38 different days were wasted, how many of those 80 witnesses were ultimately unnecessary? The 6,000 pages of transcript were at least 60 times too many. For the lead opinion, all that was necessary to fire Freshwater was proof that he had checked out library books and put them in his classroom, a classroom that contained a poster that might be considered religious.
(¶ 136} Thus concludes the sorry saga of John Freshwater, excellent junior-high science teacher, terminated as a result of an extreme overreaction of the parents of a decent student, followed by even less informed and measured responses by Mount Vernon school administrators and the school board. The Mount Vernon school board and school administration are the nominal winners of this case, but they have managed to divide a really nice community and cost the school board and/or its insurance providers well over a million dollars to free itself of a very good teacher. And the people they did it for left town.
{¶ 137} There is a clear set of winners today: the lawyers who advised a high-dollar settlement of a good case that would have proved valueless to the plaintiff parents and student if taken to trial and those who advised the Mount Vernon school board to pursue a very bad case against John Freshwater to a hollow but expensive victory in the Ohio Supreme Court. They have told themselves that they are participating in the evolved version of the Scopes trial, when in reality they have created a modern Jarndyce and Jarndyce.
{¶ 138} John Freshwater will be deemed today’s loser by superficial press accounts. He has lost his job, reportedly mortgaged his home to cover his litigation expenses, and will receive no compensation whatsoever. But John Freshwater is not today’s big loser, because he fought to prove that he actually *503 followed the rules, that he taught well, and that over a lifetime of dedication to the students in his classrooms he made a positive contribution to their lives. That proof is uncontroverted. In that most important measure of public education, John Freshwater is a winner and his final departure is a loss to the Mount Vernon schools.
{¶ 139} This court accepted jurisdiction in this case presumably to speak to the important issues of the Establishment Clause, academic freedom, and how schools may approach educating children about the scientific theories of evolution, which may directly clash with religious teachings of creation to which many children have been exposed at home and at church. Instead this court sidesteps all of the difficult issues presented in the ease leaving the resolution of all these heady matters in the hands of a lone referee. Ironically, the lead opinion in this case proves the existence of God. Apparently, he’s an R.C. 3319.16 referee from Shelby.