[Cite as *Hiss v. Perkins Local School Dist. Bd. of Edn.*, 2019-Ohio-3703.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

Tracey L. Hiss

    Appellee

v.

Perkins Local School District
Board of Education

    Appellant

Court of Appeals No. E-18-034

Trial Court No. 2015 CV 0205

**<u>DECISION AND JUDGMENT</u>**

Decided: September 13, 2019

* * * * *

Christine A. Reardon and Edward J. Stechschulte, for appellee.

D.J. Young, III, for appellant.

* * * * *

**MAYLE, P.J.**

{¶ 1} Appellant, Perkins Local School District Board of Education ("the board"), appeals the May 18, 2018 judgment of the Erie County Court of Common Pleas that ordered Perkins to reinstate appellee, Tracey Hiss, to her former teaching position and

awarded her $367,202.52 in lost wages and benefits. After a careful review of the record, we reverse the common pleas court's judgment.

## I. Procedural History

{¶ 2} Hiss worked for Perkins Local Schools ("Perkins") as a middle school health and physical education teacher and as a coach for various sports teams, including the Perkins High School ("PHS") girls' track team, from 1992 to 2015, when the board terminated her teaching contract.

{¶ 3} In May of 2013, Perkins learned that some of the girls' track team members had obtained Lidoderm patches—which are prescription analgesic patches containing 5 percent lidocaine—from Hiss. On May 14, 2013, Dr. James Gunner, superintendent of Perkins, met with Hiss to discuss the allegations and suspended her, with pay, from teaching and coaching until Perkins could conduct a complete investigation of the situation. At the same conference, Gunner told Hiss that he was turning the matter over to the Perkins Township Police Department ("PTPD") for investigation and that Perkins's investigation would be paused until the PTPD was done with the case.

{¶ 4} Hiss was criminally charged with possession of a dangerous drug, a first-degree misdemeanor, for having the prescription lidocaine patches. She participated in a pretrial diversion program—which she completed six months early—resulting in the common pleas court dismissing the charge against her.

{¶ 5} Thereafter, Perkins's investigation resumed. On February 21, 2014, Gunner sent Hiss a notice of intent to recommend the termination of her teaching contract. The

2.

notice contained 13 grounds for termination. The allegations in the notice of intent spanned from 2011 to 2013 and included multiple allegations that Hiss (1) failed to secure medicine, generally, and lidocaine (which Gunner alleged was a controlled substance), specifically, from student access; (2) without permission from Perkins, provided medicine, generally, and lidocaine, specifically, to students; (3) possessed in the workplace and without permission from Perkins lidocaine that was not prescribed to her; and (4) by allowing students access to these substances, engaged in a pattern of unprofessional conduct. Gunner indicated in the notice of intent that the lidocaine he referred to was in the form of Lidoderm patches and the other medicines were in the form of "pain relievers of unknown brands."

{¶ 6} Hiss, through counsel, objected to the notice of intent because it contained specifications of misconduct that were not addressed at the May 2013 meeting. Accordingly, Gunner held a second prediscipline conference on March 31, 2014, to address the new information.

{¶ 7} On April 28, 2014, Gunner sent Hiss a second notice of intent to recommend termination of her teaching contract, which generally relied on the same grounds as the first notice of intent. However, the second notice added an allegation that Hiss, in 2011, possessed in the workplace a controlled substance not prescribed to her, added a second possession allegation in 2013, changed the dates of two specifications from 2011 to 2012, and changed the substance in two specifications from "medication" to "controlled substance."

3.

**{¶ 8}** On May 14, 2014, the board voted to suspend Hiss without pay pending final board action on Hiss's termination. Hiss was notified of the board's decision on May 16, 2014.

**{¶ 9}** On May 21, 2014, pursuant to R.C. 3319.16, Hiss requested a hearing before a referee. The five-day hearing began on October 21, 2014, and the referee issued his report and recommendation on February 27, 2015. The referee recommended that the Board terminate Hiss's teaching contract. On March 11, 2015, the board adopted the referee's findings of fact and recommendation, and voted to terminate Hiss's teaching contract.

**{¶ 10}** Hiss appealed the board's decision to the common pleas court. On October 18, 2016, the common pleas court concluded that the board lacked good and just cause to terminate Hiss's contract. The court then held a damages hearing on November 30, 2017, to determine the amount of back pay and benefits to which Hiss was entitled. The court issued its damages award on May 18, 2018, and this appeal followed.

## II.      Facts

### A.  The "Crabtree Incident" and Perkins's Medicine Policy

**{¶ 11}** In the summer of 2012, Travis Crabtree, another teacher and coach in the Perkins school district, was at an out-of-state, non-school-sanctioned wrestling camp when he offered a student one pill of the prescription painkiller Tramadol. The student accepted—but did not ingest—the pill. Crabtree reported the incident to Michael Strohl, the athletic director for Perkins, and to the student's father (who was an assistant

4.

wrestling coach and was also at the camp). The student's mother was upset about the incident, which led Strohl to investigate the situation. As a result of that investigation, Crabtree received a letter of reprimand and was suspended from coaching wrestling for 15 percent of the 2012-2013 wrestling season. Strohl also reported the incident to superintendent Gunner, who, in turn, reported it to police in the jurisdiction where the wrestling camp was held.

{¶ 12} In the wake of the Crabtree incident, in October 2012, Strohl sent an email to all head coaches—including Hiss—reminding them that "[u]nder no circumstances should you or any assistant coach provide any type of medication to a student-athlete. This includes tylenol [sic] and aspirin." He also required the coaches to remove all over-the-counter ("OTC") painkillers from their medical kits and turn them over to Tim Pudloski, the athletic trainer for Perkins. Strohl testified that he reiterated this policy to coaches at every coaches' meeting from then on.

{¶ 13} Several other witnesses testified about the policy prohibiting coaches from giving students any medicine. Pudloski understood that Perkins had a policy prohibiting staff from giving out medicines. Prior to Strohl sending the October 2012 email, Pudloski had given athletes OTC painkillers either after contacting a parent or having a parent's prior consent. Although he stopped that practice upon receiving the email, he continued to use OTC analgesic ointments (such as IcyHot and Biofreeze) on students without obtaining parental permission because he did not believe that the ointments were covered by Strohl's directive.

5.

{¶ 14} Alice James, a guidance counselor for Perkins and a long-time coach of synchronized swimming and golf, testified that Perkins had a policy that coaches were not to give any students any type of medicine—OTC or prescription—which Strohl mentioned at every coaches' meeting she attended in the three years preceding the referee hearing. She also said that the district took the subject seriously.

{¶ 15} Additionally, Gunner confirmed the school district's policy that coaches were not to give student athletes any medicine. He elaborated that school board policy allowed the school nurse or another person designated by the board to administer medicine, but only if the student's parent had signed a written permission form. Historically, the athletic trainer (who is not a board employee) was a board designee allowed to administer medicine. Gunner could not find any written medicine permission forms for any of the students involved in this case.

## B. Initial Accusations

{¶ 16} In May of 2013, a female PHS student and track team member, K.H. ("student 3"),[1] brought Pudloski analgesic patches to apply to her knee. Pudloski did not think that the patches looked like OTC pain relief patches. When asked, student 3 said that she got the patches from Hiss. Although Pudloski was suspicious of the patches, he

---

[1] The parties and the common pleas court used various appellations for the nine students involved in this case. For ease of discussion, we identify each student with a number (e.g., student 1), numbering the first six students based on the order in which they testified at the referee hearing and the remaining three students based on when they first appear in this decision.

6.

applied one to student 3's knee. He did not call student 3's parents for permission to do so.

{¶ 17} Before applying the patch, Pudloski took a picture of it with his cellphone, which he forwarded to Dr. Gino Kubitz, a podiatrist who volunteers as a team physician for Perkins, and Dr. Matthew Petznick, a sports medicine family physician. He asked the doctors whether the patch was an OTC or prescription drug. Both doctors confirmed Pudloski's suspicion that the patch was prescription-only. Pudloski identified the board's exhibit No. 1—which consisted of three Lidoderm brand 5 percent lidocaine patches—as the same patches that student 3 brought to him in May 2013.

{¶ 18} Dr. Kubitz called Strohl, the athletic director for Perkins, to bring the issue to Strohl's attention because, as a prescription medicine, the patch could not be dispensed to people for whom it was not prescribed. When Strohl asked Dr. Kubitz for information about Lidoderm, Dr. Kubitz sent him an email that included information about Lidoderm's uses and side effects, precautions before using the drug, interactions with other drugs, and symptoms of overdose. Additionally, Dr. Kubitz noted that Lidoderm was a prescription and should only be used by the person for whom it was prescribed and that the patches could be used to mask pain symptoms, leading to injuries from overuse and trauma. Dr. Kubitz identified the board's exhibit No. 1 as Lidoderm brand 5 percent lidocaine patches and noted that the patches said "prescription only" on the wrapper. He believed that the patches were the same as the one in the picture Pudloski sent him.

7.

{¶ 19} On Monday, May 13, 2013, after speaking to Dr. Kubitz and Pudloski over the weekend, Strohl called Hiss out of her classroom to speak with her about an upcoming track meet, the number of injured track athletes that season, and the allegation that Hiss had given a prescription pain patch to a student. Although Strohl did not mention any students' names, Hiss responded to the allegation by stating that M.H. ("student 5") had stolen the patch. This was the first time Strohl had heard that a student had stolen or taken a pain patch from Hiss.

### C. Perkins Investigation

{¶ 20} After speaking to Hiss on May 13, Strohl began his investigation by speaking to students about the patches. Strohl testified that he took handwritten notes of his interviews of the students, which he then compiled into a typewritten report.[2]

{¶ 21} Strohl first spoke to student 3, whose name was mentioned by Dr. Kubitz and Pudloski. Student 3 confirmed that Hiss had given her a prescription pain patch. She also claimed that Hiss had given her the same type of patch during track season the prior year.

---

[2] The parties agreed that several exhibits—including Strohl's handwritten notes, Strohl's report, and Gunner's notes of the March 2014 prediscipline conference with Hiss—were Perkins business records, and neither party objected to the admission of the hearsay contained in those records. Further, each side acknowledged that the hearsay contained in the records did not prove or disprove what the students said, but "[i]t just is what it is."

8.

**{¶ 22}** Student 3 named H.S. ("student 2"), student 5, and M.C. ("student 6") as having received patches, so Strohl spoke with them as well. [3]

**{¶ 23}** Student 2 confirmed that Hiss had given her prescription pain patches.

**{¶ 24}** Student 5 also confirmed that Hiss had given her a prescription pain patch, which student 5 still had in her locker. Student 5 turned the patch over to Strohl, who then turned it over to Gunner. At the hearing, Strohl identified the board's exhibit No. 1 as containing the patch he received from student 5. Strohl could not recall whether student 5 gave him one patch or two, but his report indicated that student 5 had two patches, and Gunner's testimony confirmed that he received two patches from Strohl.

**{¶ 25}** According to Strohl's report, student 6 also confirmed that she had received a pain patch from Hiss.

**{¶ 26}** After speaking with these students, Strohl addressed the entire girls' track team before practice. Strohl asked the girls if any of them had received any type of patch or medicine from Hiss, either recently or in the past. Strohl testified that three additional students came forward saying that Hiss had given them different medicines—A.B. ("student 1"), M.K. ("student 4"), and K.G. ("student 7")—and that he interviewed all of them. His report, however, states that only students 1 and 4 came forward after the meeting, claiming that Hiss had given each of them two Tylenol. Students 1 and 4

---

[3] Strohl testified that student 3 named students 2 and 5, student 2 named student 5, and student 5 named student 6, but his report noted that student 3 named all three additional students.

confirmed during their testimony that they spoke to Strohl following his meeting with the track team. Based on Strohl's report, it appears that Strohl identified a fourth student, L.B. ("student 8"), as having received a patch after having a conversation with student 6's mother, and student 8 told Strohl that student 7 had received a patch from Hiss.[4] Strohl noted in his report that it was unclear whether the patch that Hiss gave student 7 was the same as the prescription patches he was currently investigating.

{¶ 27} The next day, May 14, 2013, Strohl met with superintendent Gunner to relay the information that he had gathered at that point. Strohl also presented the two patches that he had in his possession to Gunner, and at the hearing Gunner identified those patches as included in the board's exhibit No. 1. Gunner and Strohl turned the patches over to Sergeant Dan McLaughlin of the PTPD, the Perkins school resource officer. Sergeant McLaughlin received a third patch from D.B., the father of student 8, a few days later, after the PTPD learned that student 8 had a patch in her possession. Sergeant McLaughlin explained how the PTPD handles evidence and testified that the patches in the board's exhibit No. 1 were the same ones that the PTPD received from Strohl and D.B. in 2013.

{¶ 28} After talking to McLaughlin and the PTPD detectives assigned to the case, Gunner brought Hiss to his office for a prediscipline conference—as required by the collective bargaining agreement ("CBA") between Perkins and the Perkins Education

---

[4] Neither student 7 nor student 8 testified at the referee hearing to confirm or refute these details.

Association ("PEA")—on May 14, 2013. At that time, she was accompanied by the middle school principal and Tom Kinsel, a PEA representative. At the conference, which Gunner recorded, Gunner presented Hiss with the accusations against her. Hiss responded to the accusations by saying that she received the patches from her father, did not realize that they were prescription patches, and that she "never once * * * physically hand[ed] anybody anything." She also told Gunner that student 6 had grabbed patches off of Hiss's desk, student 6's mother knew about the patches, and student 6 was allowed to use the patches. The PEA representative, Kinsel, testified that he "didn't think it was really a hearing * * *"; rather, he "thought it was more here's what we're going to do." During the conference, Kinsel "got the feeling that Tracey was going to be [] removed from the position of the coach * * *."

{¶ 29} At the end of the conference, Gunner suspended Hiss from teaching and coaching because the accusations against her were "very serious" and could result in criminal charges. He also indicated that he was turning the matter over to the PTPD.[5]

{¶ 30} Due to the PTPD's involvement, Gunner did not take any further action until February 2014. By that point, the police investigation into Hiss's actions and the resultant criminal case were concluded. When he resumed his investigation, Gunner met with the students and asked each to write a statement about anything they remembered

---

[5] Kinsel and Hiss testified that Strohl continued to speak to students about Hiss after Gunner told Hiss that he had turned the matter over to police. After hearing about Strohl's further questioning of students, Gunner recalled telling Strohl to stop.

11.

regarding Hiss and any kind of medicine. He reminded them that it was a "very serious" situation and that they should "absolutely" tell the truth, "regardless of what they had told Mr. Strohl or the police department * * *."

{¶ 31} At the conclusion of his investigation, Gunner held the second prediscipline conference on March 31, 2014. Hiss attended the second prediscipline conference with Susan Dodge, a labor relations consultant with the Ohio Education Association. Gunner took notes during the conference that summarized Hiss's answers to his questions. He said that much of the information that Hiss provided was the same as the information she gave during the first conference, except that Hiss admitted at the second conference that she gave students 6 and 7 OTC pain patches, but she claimed that she had their mothers' permission to do so.

{¶ 32} Dodge reviewed Gunner's notes from the March 2014 conference and said that they did not reflect the entirety of either Hiss's or Gunner's comments during the conference. For example, at the beginning of the conference, Dodge recalled Gunner saying that the conference was not necessary, but he was doing it as a courtesy to Hiss because of her objection to his first notice of intent. Gunner's notes reflect that Hiss said "[j]ust wait if you go after me * * * the whole school district will come crashing down." (Ellipsis sic.) Dodge said that she did not "have any recollection of [that] comment * * * that's taken out of context." Instead, she recalled Hiss making reference to needing an attorney in response to Gunner's comment that he did not want a lawsuit to result from this situation.

12.

**{¶ 33}** Gunner acknowledged that he had gotten "conflicting information" during the course of his investigation. But after considering all of the information he had, he determined that "the students were being forthright and honest with me and I felt that Ms. Hiss was not." This ultimately led him to decide that good and just cause existed to recommend that the board terminate Hiss's teaching contract.

### D. Policy Basis for Gunner's Recommendation

**{¶ 34}** In determining that Hiss's conduct constituted good and just cause for her termination, Gunner said that he considered several different policies. First, he considered the board's drug-free workplace policy, which states, in pertinent part, that "[n]o employee shall unlawfully * * * distribute, dispense, possess or use any * * * controlled substance as defined in Federal and State law, in the workplace." Gunner said that the school district understood "controlled substance" to mean a prescription drug.

**{¶ 35}** Next, Gunner looked to a document from the Ohio Department of Education ("ODE") called the "Licensure Code of Professional Conduct for Ohio Educators," which the ODE uses as "the basis for decisions on issues pertaining to licensure that are consistent with applicable law * * *." As applicable to Hiss's situation, Gunner said that the ODE code of conduct prohibited teachers from using, possessing, or unlawfully distributing unauthorized drugs and specifically designated "furnishing or providing * * * illegal/unauthorized drugs to any student * * *" as "conduct unbecoming" an educator. The "DISCIPLINARY GUIDELINES" section of the code of conduct said that the presumptive punishments for a violation of the section related to drugs ranged

13.

from a 1-to-5-year suspension of the teacher's license to a revocation or denial of the teacher's license when the violation involved students.

{¶ 36} Additionally, the ODE code of conduct prohibited a teacher from failing to "accurately report information required by the local board of education * * *." Gunner claimed that Hiss failed to accurately report by not telling anyone that students had taken patches from her multiple times.

{¶ 37} Gunner also referred to the CBA between Perkins and PEA, which applied to Hiss. Section 37.02 of the CBA stated that "[n]o employee of the Perkins Local Schools while on school premises or as part of any of his/her workplace activities shall unlawfully possess, use, or distribute * * * controlled substances * * *." He said that he referred to and followed the disciplinary steps outlined in the CBA.

### E. Students' Testimony

{¶ 38} Six of the eight students who told Strohl that they had received some type of medicine from Hiss testified at the referee hearing. The board introduced written statements from the remaining two students. Through their testimony and written statements, the students presented the following facts.

### 1. Student 1

{¶ 39} Student 1 was a senior at PHS at the time of the hearing. Hiss had taught and coached student 1, and student 1 liked Hiss.

{¶ 40} Student 1 had a stress fracture in her shin during the 2013 track season. In April 2013, prior to being diagnosed with the fracture, student 1 complained to Hiss

14.

before a track meet that she was in pain and could not run. In response, Hiss told her to keep running (which, student 1 claimed, Hiss told "everyone who was hurt") and asked if student 1 had taken any "pain pills." When student 1 said that she had not, Hiss took her into Hiss's office and gave her two pills. Student 1 did not know what type of pills they were. This was the only time that Hiss gave student 1 any medicine, and student 1 never saw Hiss give medicine to any other students.

{¶ 41} Student 1 told Strohl about the pain pills after he asked the team if any of them had received any medicine from Hiss. She later spoke to Gunner about receiving pills from Hiss and wrote a statement at his request. Although student 1 initially testified that she did not see Hiss give any other students medicine, her written statement indicated that she saw Hiss give out patches and saw patches sitting in Hiss's office. When asked, she affirmed her written statement, claiming that she saw patches sitting on Hiss's desk when Hiss gave her the pain pills.

{¶ 42} When asked on cross about her reason for not participating in track her freshman year, student 1 responded that it was because of an ankle injury she sustained during basketball season. She denied that her failure to participate was because her uncle (the boys' track coach) could not coach her.

## 2. Student 2

{¶ 43} Student 2 was a junior at PHS at the time of the hearing. Hiss had taught and coached student 2, and student 2 liked Hiss.

15.

{¶ 44} In 2013, during her freshman-year track season, Student 2 suffered from severe shin splints. When she told Hiss about the shin splints, Hiss told her to use ice, rest as much as possible, and follow Pudloski's instructions. Toward the end of the track season, in April or May 2013, Hiss called student 2 to her office after practice. Hiss shut the door, gave student 2 two pain patches, told her to use the pain patches to help her shins, and said "'You didn't get these from me.'" At Hiss's direction, student 2 asked her mother if she could use the patches, which her mother approved. Even though Hiss told student 2 not to tell anyone where the patches came from, student 2 told her mother that she got the patches from her track coach, Hiss. Student 2 identified the board's exhibit No. 1 as patches similar to the ones she received from Hiss. Student 2 never saw other students in possession of pain patches.

{¶ 45} After student 2 met with Strohl, Hiss called her and at least one other student[6] into Hiss's office to discuss the patches. According to student 2, Hiss "told us that we took them from her, but that wasn't true, and she also told us that we wouldn't be running * * *" at the conference finals track meet. Student 2 believed that Hiss's statement was meant to "cover for herself or something," which angered student 2. She also believed that she was not allowed to run in the conference finals because of the

---

[6] Student 2 initially testified that Hiss called her and students 3, 5, and 6 into the office, but on cross, student 2 said that only she and student 3 were called into Hiss's office, which is consistent with student 3's and Hiss's testimony.

patches, but mentioned to the police that Hiss had been told not to allow injured girls to run at the meet.

{¶ 46} In February 2014, student 2 wrote a statement about the patches for Gunner, which mirrored her hearing testimony.

### 3. Student 3

{¶ 47} Student 3 was a senior at PHS at the time of the hearing. Hiss had been both her teacher and her coach.

{¶ 48} Student 3 had knee problems that began during her freshman year and required surgery. During a track practice in 2012, student 3 was sitting in the locker room when Hiss gave her a pain patch and instructed her on how to use it. She identified the board's exhibit No. 1 as the same type of patch that Hiss gave her.

{¶ 49} Student 3 also testified that Hiss gave her another pain patch during her sophomore year. This is the patch that triggered the investigation into Hiss providing prescription drugs to students. That time, rather than giving student 3 a patch directly, Hiss told student 3 to come to Hiss's office after practice to pick up a patch. Student 3 said that Hiss walked out of her office, held up approximately four patches in front of approximately eight track team members, and said "'Come get these, I'll lay them on my desk, you can get them after practice when you're done.'" Student 3 took a patch and went to Pudloski to ask him how to apply it.

{¶ 50} Within a couple of days, Strohl approached student 3 to ask about the patch. Later that day, Hiss called students 2 and 3 into her office to tell them that they

17.

would not be running in the conference finals meet because they were hurt. Student 3 recalled Hiss saying at the meeting that "'I didn't directly give [the patches] to you, you came and picked them up off of my desk,'" and that Hiss was "obviously upset."

{¶ 51} Gunner asked student 3 to write a statement about Hiss and the patches. Her February 2014 statement indicated that Hiss gave her two "packs" of pain patches during the 2013 track season and told student 3 that she would lay the patches on her desk for student 3 to take after practice. On cross, student 3 clarified that Hiss had given her one of the patches while student 3 was at her locker at the beginning of the season and that student 3 had taken one patch off of Hiss's desk later in the season. In total, student 3 said, she had received three patches from Hiss: one during her freshman year and two during her sophomore year. She noted that Hiss "never acted sneaky about it" and that student 3 believed that Hiss "just wanted to make sure that we were healthy, but she did it the wrong way."

{¶ 52} Student 3 identified four other students she had seen holding or wearing patches similar to the ones Hiss had given her, including students 1, 5, and 6, as well as a former student who had since graduated. Although student 3 had seen the other students with patches, she was not with any of them when they got the patches from Hiss.

{¶ 53} Student 3 also recalled a track meet in 2013 where she pulled out of an event shortly before it was scheduled to begin because of knee pain. Student 3's doctor was at the track meet and advised her not to run to prevent the issue from getting worse. Student 3 said that Hiss was upset when student 3 told her that she could not run.

18.

{¶ 54} When asked on cross if student 3 made a statement to the effect of "How come I didn't get one of those?" when student 6 told Hiss that student 6 had put on one of Hiss's patches, student 3 denied making such a statement.

### 4. Student 4

{¶ 55} Student 4 was a junior at PHS at the time of the hearing. Hiss had taught and coached student 4, and student 4 liked Hiss. She also said that "everyone" liked Hiss as a coach.

{¶ 56} Student 4 participated in the indoor track season during her freshman year. At one of the meets, student 4 told Hiss that she had a headache, prompting Hiss to give her ibuprofen and say "'You didn't get it from me.'"

{¶ 57} Student 4 saw Hiss give a patch to student 3 in the spring of 2013. She said that she was approximately 20 feet from Hiss's office when she saw through the window that Hiss had given student 3 a little box or thin package. Student 4 saw the patch again later that day when student 3 brought it into the trainer's room to have Pudloski apply it for her. Student 4 identified the board's exhibit No. 1 as the same type of patch that she saw student 3 with in the trainer's room, although she admitted on cross that she had only seen the patch from about five feet away.

{¶ 58} Student 4 told Strohl about the ibuprofen following his meeting with the track team. On cross, she said that she had never told anyone about the pain reliever before Strohl asked because she did not "think it's that big of a deal."

19.

**{¶ 59}** Like the other students, Gunner asked student 4 to write a statement about the incident. In her February 2014 statement, student 4 said she knew of students 2, 3, and 5 receiving "medical patches" to "get rid of leg pains" during the 2013 track season. Student 4 also said that Hiss gave her ibuprofen for a headache at a track meet. The meet listed in student 4's statement was different from the meet she testified to and the meet that she told Strohl about (as documented in his report). Student 4 also wrote that Hiss "would always remind us that she could get in trouble if she gave us anything and not to tell anyone."

**{¶ 60}** Regarding the discrepancy between Strohl's report, in which he reported that Hiss gave student 4 Tylenol, and student 4's written statement, in which she reported that Hiss gave her ibuprofen, student 4 said that she uses the terms "Tylenol" and "ibuprofen" interchangeably.

### 5. Student 5

**{¶ 61}** Student 5 was a senior at PHS at the time of the hearing. Hiss had taught and coached student 5, and student 5 liked Hiss. She also said that Hiss was popular with the track team members.

**{¶ 62}** During her sophomore-year track season, student 5 tore a tendon in her knee. As the end of the season approached, student 5's injury had improved, but she was still having pain. After practice one day, Hiss called student 5 into her office, had her close the door, and gave her a patch that Hiss took out of a black bag. Student 5 said that the patches in the board's exhibit No. 1 were identical to the patch that Hiss had given

20.

her. Hiss told her to let her parents know about the patch, but not to tell anyone who had given it to her. Student 5's mother told her not to use the patch because her mother did not know what the patch was.

{¶ 63} A couple of days after student 5 got the patch from Hiss, Strohl called student 5 to his office to discuss the patch. She testified that she told Strohl the same version of events that she testified to at the hearing. She also gave Strohl the patch that she received from Hiss.

{¶ 64} Sometime after student 5 spoke to Strohl, Hiss called student 5. Student 5 did not answer the phone, but, after talking to her mother, called Hiss back. She recorded the conversation. The call began with Hiss asking about student 5's knee and pain level and discussing the events that student 5 was going to run at the track meet the next day. Hiss then asked about student 5 being called to Strohl's office. When student 5 said that "it was about those patch thingies," Hiss responded, "[w]ell, you didn't use any, so that's good." Hiss also said, "I didn't give them to you, did I?" when student 5 recounted that Strohl asked about when and where student 5 had gotten the patch. Hiss later reiterated that "[t]he thing is, the laughing thing is, I didn't give anybody any of them. Remember, you guys took them all off my desk." Student 5 responded, "Yeah." Student 5 testified that, although she ignored Hiss's comments about the patch situation, Hiss continued to talk about it. During the conversation, Hiss said that she did not give the girls anything and that she told the girls they needed consent from their parents.

21.

{¶ 65} Hiss pointed out on cross-examination that the report of student 5's statement to the PTPD noted that student 5's mother answered the phone when Hiss called student 5's house. Student 5 believed that the police must have confused what she told them because her mother was not home that night. Instead, as she testified on direct, student 5 explained on cross that Hiss called her cellphone, but student 5 did not answer. Instead, she called her mother for advice before calling Hiss back.

{¶ 66} Student 5 also admitted that she had gotten "one [patch] just for one day" from Dr. Petznick. She believed that she had received the patch from the doctor before she received the patch from Hiss. She testified that the patch from the doctor was smaller than the patch from Hiss.

### 6. Student 6

{¶ 67} Student 6, a PHS graduate and former track team member, said that Hiss had taught and coached student 6. Student 6 said that she liked Hiss as a teacher and respected her as a coach, but did not "respect [Hiss] as a person." She also said that Hiss was popular with the track team.

{¶ 68} During her freshman year, student 6 began having knee pain, which she told Hiss about. Hiss initially told student 6 to put ice on her knee and see Pudloski. Eventually, though, Hiss gave student 6 pain patches. At a track meet, student 6 told Hiss that she was having knee problems, which prompted Hiss to give her a patch while student 6 was either getting onto or off of the bus. Student 6 tried to use the patch, but it did not stick to her knee well, so she took it off. She said the patch she received at the

22.

meet looked exactly like the patches in the board's exhibit No. 1. On cross, student 6 denied that she was given the patch for back pain and did not remember whether Hiss talked to her parents before giving her the patch. A.C., student 6's mother, recalled a track meet during student 6's freshman year where Hiss came up to A.C. and either said that she had given student 6 a patch for her knee or was going to give student 6 a patch for her knee. She did not recall the specifics of the conversation, but remembered that the conversation happened.

{¶ 69} A second time (that student 6 believed was during her freshman year, but was unclear on exactly when the incident happened), Hiss gave her a patch in Hiss's office after practice. And, on a third occasion (during student 6's sophomore year), Hiss again gave her a patch in her office after practice.

{¶ 70} In 2013, student 6's junior year, Hiss again gave student 6 a patch while they were in Hiss's office after practice. This time, someone else, whom student 6 could not recall, was with her. She said that Hiss always took the patches out of a black bag. When asked, student 6 recalled Hiss handing her and the other student each a patch. She did not recall the patches falling out of Hiss's bag, Hiss leaving the patches sitting on her desk, or asking Hiss for a patch.

23.

{¶ 71} Student 6 also said that she had seen other track team members with patches, including students 2, 5, and 7 and S.A. ("student 9")[7]. She said that she was acquainted with these girls through track, but did not "hang out with them afterwards."

{¶ 72} Student 6 said that her doctor had prescribed patches for her as well, and, although student 6 could not remember exactly when she got the prescription, she knew it was after her freshman year. She said that Hiss's patches did not work well for her, so she took them but did not use them. She kept the patches from Hiss at her house, where she claimed that she stored them separately from the ones she got from her doctor. Student 6 claimed to have turned some of the patches over to the police, but said that her mother, A.C., who was outside the hearing room, had another of Hiss's patches in her purse. The patch that student 6 produced had the same batch number as one of the patches turned over to the PTPD and admitted at the hearing as part of the board's exhibit No. 1. Student 6 maintained that she knew the patch she brought to the hearing was from Hiss because when "all this went down * * *," she "discriminated" between the patches from Hiss and her prescribed patches by storing them separately.

{¶ 73} Regarding the newly-produced patch, A.C. testified that the patch had been in the drawer of their computer desk since student 6 brought it home from practice during her junior year. A.C. said that student 6 told her about the patch when she brought it home, but claimed that the patches did not work. When student 6 left the patch on the

---

[7] Student 9 was not interviewed, and did not testify or provide a statement.

desk, A.C. put it in the drawer. A.C. confirmed that student 6's doctor had given her some sample pain patches, but that the samples' wrappers were different from the patch student 6 got from Hiss and that the samples were stored in a medicine cabinet, not the desk drawer. A.C. said that "it didn't bother" her that student 6 had the patch because student 6 had been getting patches from Hiss since her freshman year.

{¶ 74} In February 2014, Gunner asked student 6 to write a statement about Hiss and the patches. Her statement indicated that Hiss had given student 6 patches for her knee during student 6's freshman and sophomore years. Student 6 also saw Hiss give other students patches and Advil those years. Her junior year, Hiss gave student 6 and other students patches and handed out OTC painkillers "to a lot of girls."

{¶ 75} Regarding her junior year, student 6 noted in her statement that Hiss took the patches from a black bag, which contained at least six to eight patches, and that Hiss told student 6 to get permission from her parents before using the patches.

{¶ 76} After the school's investigation into the situation began, Hiss came up to student 6 at a track practice and said "'I didn't give you anything, right?' or something along those lines." Student 6 testified that Hiss was "really mad" and "really, really upset" when she made that statement.

{¶ 77} On cross, student 6 admitted that she had been disciplined under Perkins's athletic code of conduct prior to May 6, 2013 (the date of the incident that precipitated the school's investigation into the patches) and that another offense would have gotten her suspended from sports for a season. A.C. confirmed that student 6 had been

25.

disciplined. She said that student 6 and other students were at her house and, although the other students were drinking, student 6 did not get an underage drinking charge related to the gathering. Strohl disciplined student 6 because the drinking had happened at her house.

{¶ 78} When asked, Student 6 and A.C. both denied any knowledge of student 6 making an allegation during her sophomore year that Hiss drove a drunk student home.

### 7. Students 7 and 8

{¶ 79} During the hearing, counsel for the parties agreed to the admission of several exhibits for "whatever weight [the referee] want[ed] to place on * * *" them. This included statements from two students—student 7 and student 8—who did not testify at the hearing, and a report from a polygraph examination that Hiss took regarding events on May 6, 2013. The referee allowed the admission of the exhibits.

{¶ 80} In her statement, student 7 said that Hiss gave her a "heating pad" for her back in either the winter or spring of 2011. She said that she had her parents' consent before taking the patch. She also said that she did not believe that Hiss would do anything to hurt a student because "I know that [Hiss] genuinely cares about all of us."

{¶ 81} Student 8 said in her statement that Hiss had physically handed her a prescription patch for her back pain. Gunner's notes on student 8's statement indicate that Hiss gave student 8 a patch at a track meet in 2011 that student 8 described as "[k]ind of like an Icy Hot [sic]." Hiss gave student 8 two patches, one that student 8's mother put

26.

on student 8's back at the meet and one that student 8's father eventually turned over to police.

### F. Hiss's Character Witnesses

{¶ 82} Hiss presented the testimony of six character witnesses who provided the following facts.

{¶ 83} Linda Bixler, a secretary in the Perkins athletic office, said that Hiss was compliant with requirements from the athletic office and that Bixler never saw Hiss behave unprofessionally as a coach.

{¶ 84} Jennifer Venerucci testified that she knew Hiss both personally and professionally; she had taught with Hiss and had been taught and coached by Hiss when she was a student at Perkins. She called Hiss "enthusiastic," both as a teacher and a coach, and did not have anything negative to say about Hiss.

{¶ 85} Dawn Sullivan was a secretary at the Perkins middle school. She said that Hiss was compliant with requirements from the office and was very dependable and dedicated, to the point that she would come in on her sick days to make sure that the substitute had lesson plans for her classes. The number of disciplinary referrals from Hiss's classroom was on the low end of the spectrum, and Sullivan (who worked in close proximity to Hiss's classroom) had never heard Hiss's classroom being out of control. She also said that Hiss was involved in charitable events at the school and "took care of" a combined race and food drive for years.

27.

{¶ 86} Christa Keegan, another Perkins teacher, said that she had taught with Hiss and was friends with her. Keegan's daughter was one of Hiss's former students and had been on the PHS track team. Keegan said that, as a coach, Hiss was motivational, energetic, and had a good relationship with the students. She also said that Hiss was one of her daughter's favorite teachers. Keegan did not see Hiss do anything that risked harm to a student. As a teacher, Keegan said that Hiss was dedicated to her students, her classes were well-behaved, the students seemed to like and respect her, and her lessons were very relatable to the students.

{¶ 87} Jacqueline Jensen, a pharmacist who worked with Hiss as an assistant track and cross country coach, testified that she saw Hiss give a student OTC allergy medicine, after contacting the student's parents, during a trip to a cross country meet in 2012. She did not witness Hiss giving students medicine at any other time.

{¶ 88} Hiss and Jensen shared an office, but Jensen did not have a key until after Hiss was suspended. As a result, Hiss would leave the office unlocked so that Jensen could put her things in it before practices. Jensen had seen two or three patches sitting on Hiss's desk, but could not recall if she locked the office door the day she saw the patches. She also did not see Hiss holding up patches and offering them to students.

{¶ 89} Jensen was aware that, at some point, student 5 received patches from a doctor, but Jensen did not believe that they were prescription patches because they did not have a prescription label on them.

28.

{¶ 90} Dante Shipp was another assistant track coach who worked with Hiss, had been one of her students, and knew her socially. He testified that he never saw Hiss doing something that risked harm to a student. As a coach, Hiss "always tried to get the most she could out of our athletes," which he said could be "kind of rough," and that she did what she could to help the students outside of track.

{¶ 91} Regarding student 3, Shipp recalled that she had withdrawn from a track meet when it was too late to run a substitute and that Hiss was calm, but upset, about trying to find a last-minute replacement.

{¶ 92} Shipp said that neither Strohl nor Gunner questioned him about the allegations against Hiss.

{¶ 93} Kinsel was a retired Perkins teacher; a former PEA representative; Hiss's former teacher, athletic trainer, and colleague; and Hiss's neighbor. In addition to testifying about the May 2013 prediscipline conference, Kinsel also testified as a character witness for Hiss. Kinsel had known her for 35 years. He testified that Hiss was an excellent coach and role model, had a wonderful rapport with students, and understood what it took to be a good athlete and team member. He did not believe that Hiss would ever intentionally place a student at risk of harm. He thought that Hiss was a wonderful person and that others in the community shared his opinion. He also described how Hiss had reopened her parents' business shortly after her mother died as a way to help her father with his grief.

29.

**{¶ 94}** Additionally, each character witness (with the exception of Jensen and Kinsel) also testified that he or she never saw Hiss give medicine to a student.

## G. Hiss's Testimony

### 1. Hiss's Background

**{¶ 95}** Hiss testified that she attended school and played sports at Perkins. She was an accomplished high school athlete in volleyball, basketball, and track. She began coaching junior high basketball and track while she was attending college at Bowling Green State University. She graduated in 1990 with a bachelor's degree in education, specifically in health and physical education for grades 7 through 12, with a minor in coaching.

**{¶ 96}** Hiss began teaching middle school health and physical education at Perkins in 1992. After receiving her degree, Hiss did not apply for teaching positions in any other school districts because she only wanted to teach at Perkins. This resulted in her working as a substitute teacher for Perkins and at a family restaurant until she was hired in 1992. She remained in that position until the incident with the patches. She received favorable teaching evaluations throughout her career and Strohl recommended that her coaching contracts be renewed every year prior to 2013.

**{¶ 97}** Hiss also continued to coach various sports at Perkins after receiving her teaching degree. She said that her track record was 117 wins and 15 losses, which she considered "pretty good" and was something of which she was proud. Hiss testified to the extra time she spent on coaching activities that were not required by her coaching

30.

contract—for example, organizing a food drive at the middle school, organizing the Pirate Relays track meet held at PHS, and creating memory books that included team pictures, news articles, and statistics to give to each team member at the end of the season.

{¶ 98} While in college, Hiss was involved in an automobile accident that left her with back pain. She would use OTC analgesic patches to help with the pain. Sometimes she would buy the patches and sometimes her father would buy them for her, but she always had patches in her bag. She identified the board's exhibit No. 1—the Lidoderm brand 5 percent lidocaine prescription patches—as patches similar to ones her father would have given her. According to Hiss, the first time she saw a patch like the ones in exhibit No. 1 was May 14, 2013, when Gunner called her in for the first prediscipline conference. She admitted that the Lidoderm patch Gunner showed her belonged to her and assumed that it had come from her father. Following the initial prediscipline conference, Hiss learned from her father that he had not been prescribed and did not purchase the Lidoderm patches, but that someone had given him the patches at a pool tournament.

### 2. Hiss's Version of Events

{¶ 99} Regarding the May 6, 2013 incident with the pain patches, Hiss testified that she was preparing for the Pirate Relays, which took a significant amount of time and effort and led to "a very chaotic busy week." She said that the Pirate Relays meet was

31.

busier than a normal track meet because she was trying to organize the event and ensure that it ran smoothly while also trying to coach her athletes.

{¶ 100} On May 6, Hiss met with Strohl after school regarding some details of the Pirate Relays and went to the athletic office to get information to hand out to the team. When Hiss got to her office in the locker room, students 6 and 9 came over. Hiss also thought that student 5 was standing in the doorway. As Hiss was talking to them, she pulled some papers out of her bag and three or four pain patches fell out. She believed that the patches were OTC analgesic patches. Hiss said that student 6 asked what the patches were, and Hiss told her they were for Hiss's back pain. According to Hiss, student 6 asked if the patches could help with her knee pain, to which Hiss replied, "'They may, but I'm not giving you anything unless you have a parent's consent. * * * I am not getting in trouble like Coach Crabtree.'" Hiss then walked out of the office and began practice. She left the patches on the corner of her desk and did not lock the office when she left because Jensen needed access to the office when she arrived.

{¶ 101} The next morning, on May 7, Hiss sent a text to student 5 asking about her knee. Student 5 responded, in pertinent part, "my mom was looking at that pad thing and we forgot all about it so she said we would put it on tonight if that's fine?" Hiss's only response was that student 5 probably would not run at the Pirate Relays. Hiss believed that this text message proved that student 5 had taken a patch from her office on May 6 and claimed that she did not say anything to student 5 about the patches because she would not "yell at a student over—or say something to find out through via text."

32.

{¶ 102} Later that day, before track practice, Hiss was in the locker room talking to students 2, 3, 6, and 9 when student 6 told Hiss that she had taken a patch and received permission from her mother to use it. Hiss responded, "'You [student 6] did what?'" Then student 5 came into the locker room, saying that she just came from seeing Dr. Petznick, who had given her patches.[8] Hiss told her to have Pudloski apply them for her and then held practice as normal.

{¶ 103} The next time Hiss heard about the patches was on May 13, 2013, when Strohl came to her classroom. During the conversation, Hiss said that Strohl blamed her coaching style for track team members being injured and told her she was not to run injured athletes at the conference finals. Hiss interpreted that to mean that students 2 and 3 could not run. Strohl then told her that he had heard that she had given students prescription patches. Her response was "'Mike, I didn't give anybody anything. * * * If you're referencing [student 6], had to take them out of my office.'" Strohl then left. Hiss recalled specifically telling Strohl that student 6 was the one who took a patch, even though Strohl testified that Hiss named student 5.[9]

{¶ 104} At practice that afternoon, Hiss told students 2 and 3 that they could not run at the conference finals. According to Hiss, student 3 responded by saying "'Well, I

---

[8] Dr. Petznick testified that he had treated students 5 and 6. His records indicated that neither student had been prescribed lidocaine patches.

[9] Students 5 and 6 have the same first name and were confused by the witnesses throughout the record.

33.

hope this isn't over the patch thing.'" Hiss ignored student 3's statement and reiterated that Strohl said she could not run injured athletes. Hiss later spoke to student 2's mother, who was a little upset that student 2 could not run at the conference finals, but did not mention anything about the patches.

{¶ 105} Hiss also heard at practice that some of the girls were called to Strohl's office earlier that day. Hiss specifically asked student 6 what she had said to Strohl and recalled that student 6 told Strohl that Hiss could not give anyone anything without parental permission, which was different from student 6's recollection of the encounter.

{¶ 106} That night, Hiss called student 5. Hiss confirmed that she made the statements on the recording of the phone call. But her primary purpose for making the call was to find out how student 5 was feeling before the track meet the next day because it was the first meet in weeks at which student 5 was going to be allowed to run. It was common for Hiss to communicate with her athletes by phone and text message.

{¶ 107} The next day, May 14, Hiss was called to Gunner's office in the afternoon. The middle school principal and Kinsel went with her. The principal took her school-issued laptop and keys, as well as her personal cellphone (which was returned to her at the end of the conference). Hiss testified that the first time she realized that the patches she had were prescription (rather than OTC) was at this conference. She told Gunner that she assumed the patches were OTC and that she had never been prescribed pain patches by a doctor. Hiss claimed that the patches must have been stolen. She did not, however, tell Gunner that student 5 had admitted to taking a patch. Hiss had no

34.

reason to believe that any of the students involved would want to hurt her or her career. Further, although Hiss told Gunner that student 9 was with student 6 on May 6, Gunner did not interview student 9.

{¶ 108} While the investigation of the criminal case was pending, Hiss took a polygraph examination, the results of which she submitted to the referee. The examiner asked Hiss four questions about events on May 6, 2014:

1. On May 6th [sic], did you tell the girls they could take the prescription pain patches? * * *

2. On May 6th [sic], did you give any of the girls a prescription pain patch? * * *

3. On May 6th [sic], did you give anyone a prescription pain patch? * * *

4. On May 6th [sic], did you tell the girls you could not give them anything without a parent's consent? * * *

{¶ 109} Hiss answered "no" to the first three questions and "yes" to the fourth question. The examiner concluded that Hiss "told the substantial truth during the examination."

{¶ 110} When discussing the second prediscipline conference, Hiss took issue with some of her answers as recorded in Gunner's notes. She expanded upon several of the answers that Gunner abbreviated, for example, by reiterating that she understood the medicine policy to prohibit coaches from providing medicine to athletes without parental

35.

consent, restating that she was unaware before May 14, 2013, that she had prescription patches, and clarifying that she understood that having prescriptions drugs that were not prescribed to her was illegal and that she would not have had the lidocaine patches if she had known that they were prescription drugs. In response to one of Gunner's questions, Hiss told him that she kept a number of patches in her bag because she "wanted to be sure [she] had enough" patches. When Gunner asked her to clarify what she meant by "enough," he recorded her answer as "For my back * * * and the * * * kids * * *." (Ellipses sic.) Hiss denied saying "and the * * * kids * * *." (Ellipses sic.) She also explained that she did not report the patches missing because she believed that they were OTC patches, she did not believe that taking OTC patches equated to the theft of drugs, and students 5 and 6 got their parents' permission to use the patches after taking them. And Hiss clarified a place in Gunner's notes where he used student 6's name when referring to an incident involving student 5. She also said that Gunner incorrectly recorded her saying "no" when asked if she and student 4 got along; her answer should have been "yes." Finally, she denied making the comment that "the whole school district will come crashing down" if Gunner "went after" Hiss.

{¶ 111} Hiss did not recall receiving the email that explicitly stated coaches were not to give athletes any medicine, although she admitted that her email address appeared in the list of recipients. Regardless, she did not believe that OTC analgesics such as IcyHot fell under that policy. She said, however, that she would never allow students "access to anything" if she returned to teaching at Perkins.

36.

{¶ 112} Hiss steadfastly maintained that she did not provide pain patches to the students beyond giving students 6 and 8 OTC patches one time each, after each girl's parents had given Hiss permission to do so. Regarding student 8, Hiss recalled giving her two patches (that Hiss maintained were OTC), one to use immediately and one to use later.

{¶ 113} Hiss did, however, confirm Jensen's testimony that Hiss had given a cross country team member an OTC medicine during a team trip, but only after speaking with the student's mother and receiving permission. Hiss believed that she followed the board's policies when she gave the cross country student medicine. Hiss introduced an email from the student's mother that confirmed Hiss's version of events.

{¶ 114} Hiss also steadfastly maintained that she was unaware that she had prescription patches in her possession. And, because the patches were not prescribed for her, she said that she would not have had possession of the patches if she had known that they were prescription.

{¶ 115} Overall, Hiss felt that Strohl treated her situation very differently from Crabtree's situation and believed that the entire thing could have been resolved if she had been allowed to speak with the students' parents about it (as Strohl had allowed Crabtree to do).

### 3. Response to Students' Testimony

{¶ 116} Generally, Hiss claimed that the students' testimony that contradicted her version of events was untruthful and that many of the events never happened.

37.

{¶ 117} *Student 1.* Hiss claimed that Student 1's testimony and written statement were untrue. Hiss claimed that she knew which track meet student 1 was referring to and that student 1 did not participate at that meet. She also claimed that she would not have had any type of painkillers with her and would not have left the track to get pills for student 1.

{¶ 118} Hiss also testified to some issues that she had had with student 1's family. Student 1's father wanted the boys' track team coach (who is student 1's uncle) to coach student 1, and Hiss said that student 1's father was generally unhappy with the girls' coaches. Hiss explained to him that it was not possible for the boys' coach to coach student 1, which resulted in student 1 not participating in track her freshman year. Hiss had also heard that student 1's uncle wanted Hiss's job as the girls' track coach, and testified that student 1's uncle had questioned the workouts and training programs that Hiss used with the girls' track team.

{¶ 119} *Student 2.* Hiss claimed that Student 2's testimony and written statement were untrue. She maintained that she did not give student 2 any patches at any time. Hiss did not have any issues with student 2 or her family.

{¶ 120} *Student 3.* Hiss claimed that Student 3's testimony and written statement were untrue. She maintained that she never provided student 3 with any patches. She said that she was concerned about student 3's injury and communicated with student 3's parents about it. Student 3's father forwarded an email from Hiss regarding student 3's injuries to Strohl, claiming that Hiss had never before communicated with him regarding

38.

student 3's injury. Hiss denied that student 3's father's statement to Strohl was true. Instead, Hiss said that she had spoken to student 3's mother and father many times about student 3's knee injury and surgery. She never had any disputes with student 3's parents.

{¶ 121} Hiss recalled the incident where student 3 belatedly pulled out of a track meet differently. She said that she had asked student 3 earlier in the day if she thought that she could run, and student 3 had assured Hiss that she could. The meet was very structured and had a regimented substitution process. When student 3 decided that she could not run, it was too late for Hiss to substitute another runner. Hiss said that she was upset that she was unable to make a substitution and that this was not the first time that student 3 had decided at the last minute that she could not run. Hiss believed that it was student 3's way of choosing the events she wanted to do, rather than running the events she was assigned.

{¶ 122} *Student 4.* Hiss claimed that Student 4's testimony and written statement were largely untrue, with the exception of student 4's written statement that Hiss always reminded the students that she would get in trouble if she gave them any medicine. She said that she never gave student 4 any type of painkiller. She also said that the patches she kept in her bag were "loose-leafed" and would not have been in a box, as student 4 described. Hiss also pointed out that student 4's statement indicated that student 4 received the pills at an outdoor track meet, but student 4 testified that she received the pills at an indoor track meet. Additionally, contradicting student 4's statement that her

39.

parents were not at a track meet, Hiss said that one of student 4's parents was at every meet.

{¶ 123} *Student 5.* Hiss said that nothing in student 5's written statement to Gunner was true, with the exception of Hiss calling student 5. She would have called student 5 regardless of whether the patch situation had happened because she was concerned about student 5 running for the first time in weeks and wanted to make sure that student 5 was ready. Hiss saw the patches that student 5 was prescribed by her doctor, which came in a box, and sent student 5 to Pudloski to have him apply the doctor's patches. Hiss said that she did not have any issues with student 5. She denied ever giving student 5 a pain patch.

{¶ 124} *Student 6.* Hiss claimed that Student 6's testimony and written statement were largely untrue, with the exception that she had given student 6 an OTC patch at a track meet after receiving permission from her mother, A.C. Hiss also characterized the conversation she had with student 6 on May 13 differently. Hiss said that she asked student 6 if student 6 had been called to Strohl's office that day and, when student 6 responded affirmatively, asked her what she said to Strohl. She admonished student 6, "'I hope you told him the truth, that I specifically told you I couldn't give them to you unless there's a parent's consent, I didn't want to get in trouble like Coach Crabtree.'" According to Hiss, student 6 said that she told Strohl she had a patch and that Hiss told her that Hiss could not give student 6 a patch without parental consent.

40.

**{¶ 125}** Hiss believed that student 6 was motivated to make up this story because student 6 had been disciplined under the Perkins athletic code of conduct previously and would be suspended from athletics for an entire year if she got in trouble again. She also said that student 6 was involved with an incident where some students reported to Strohl that Hiss had driven a drunk student home from a party. Strohl would not provide Hiss with details of the accusation, so Hiss submitted a written statement to the PTPD with her version of events. Nothing came of the incident. Regardless, Hiss said that she had concerns about coaching student 6 after this. When she told Strohl about her concerns, he told her to "be professional." By the next year (2013), Hiss's relationship with student 6 had improved and Hiss did not have any more concerns about coaching student 6. Hiss also testified that student 6 was part of a group of girls who harassed Hiss's daughter.

**{¶ 126}** Hiss had not heard from either student 6 or A.C. that student 6 was given samples of prescription pain patches from a doctor.

**{¶ 127}** *Student 7.* Hiss agreed with student 7's version of events, i.e., that Hiss had given student 7 a patch for back pain (student 7 did not know whether the patch was prescription or OTC) after getting consent from student 7's parent.

**{¶ 128}** *Student 8.* Regarding student 8's written statement to Gunner, Hiss disagreed with her characterization of the patch that Hiss gave her as a prescription patch. Hiss said that she gave student 8 two OTC patches after receiving permission from student 8's mother, who immediately applied one of the patches to student 8's back.

41.

## H. Perkins's Rebuttal Testimony

{¶ 129} Perkins presented superintendent Gunner's testimony on rebuttal, during which he pointed out some inconsistencies between statements Hiss made during the May 2013 prediscipline conference and what she testified to at the referee hearing. Specifically, he said that Hiss was adamant that she had no knowledge of any students having patches at all, and that she did not give any students any patches. He noted that Hiss later admitted at the March 2014 prediscipline conference that she had given students 6 and 7 OTC patches with their mothers' permission. Hiss did not mention at either conference that she had given student 8 a patch.

{¶ 130} Additionally, Gunner said that Hiss did not tell him that student 5 admitted to taking a patch from Hiss's office or produce any evidence that the patches were stolen. The first he heard of the text message from student 5 (in which she purportedly admitted to taking the patch) was at the referee hearing. If he had seen evidence that the patches were stolen, he would have investigated the incident differently.

{¶ 131} Gunner explained that the administration's response to Hiss's situation was different from its response to Crabtree's situation because Crabtree's situation was a one-time incident that happened off of school property during the summer when Crabtree was not being paid as a coach. He did not view Hiss's situation as comparable because it involved eight students over three years during school-sanctioned events while Hiss was being paid as a coach. Gunner found significant the fact that Hiss's misconduct occurred after the Crabtree incident, when Strohl began repeatedly warning coaches that they were

42.

not to give students medicine under any circumstances.  Gunner said that Hiss also admitted to giving students patches (albeit OTC patches) after the Crabtree incident, which was against policy regardless of whether the parents gave permission.  He felt that he had to take disciplinary action in Hiss's case because the students consistently told him that Hiss gave them prescription patches over multiple years, which was only contradicted by Hiss's statements that she did not.

## I.  The Referee's Report and Subsequent Proceedings

{¶ 132} The referee issued his report and recommendation on February 27, 2015.  In it, the referee found that the board had policies that prohibited teachers from possessing controlled substances, distributing controlled substances to students, and distributing other medicines to students without a parent's permission, and that Hiss was aware of these policies.  Despite Hiss's "storied career as a teacher, coach, and member of the Perkins community," the referee recommended that the board terminate Hiss's teaching contract because she committed "numerous and egregious" violations of Perkins's policies regarding the provision of medicine to students.  He based his recommendation on the "overwhelming evidence" produced at the hearing, including the "credible testimony" from students that Hiss gave them the patches and painkillers and told them not to tell anyone where they got the medicine.

{¶ 133} In reaching his recommendation, the referee specifically found that the students provided credible testimony and that Hiss was not credible, characterizing Hiss's testimony as "incredible and disappointing."  He also found that Hiss had reason to be

43.

less than truthful, but the students did not, and that Hiss's character witnesses were not eyewitnesses to the incidents at issue and could not refute the direct testimony from the board's witnesses. The referee also discounted Hiss's attempts to undermine the students' credibility and to show that some of the witnesses were biased against her.

{¶ 134} The referee noted that although Hiss attempted to show that she was treated differently from Crabtree, the referee found that her situation was "substantially different." That is because Crabtree "self-reported his actions, he did not engage in a cover-up, and it was a single incident," while on the other hand, the situation with Hiss "involved multiple incidents and student-athletes, it was over an extended period of time, and while Ms. Hiss had denied any wrongdoing, [the referee found] that her denials were not credible and that she attempted to cover-up her actions and place the blame on the student-athletes."

{¶ 135} On March 11, 2015, the board adopted the referee's findings of fact and recommendation and voted to terminate Hiss's teaching contract.

{¶ 136} Hiss appealed the board's decision to the common pleas court, as permitted by R.C. 3319.16, claiming that the board did not have "good and just cause" for terminating her contract. Both parties moved for summary judgment. In an October 18, 2016 judgment, the common pleas court, after adopting a labor arbitration standard for "just cause" known as the "Daugherty test,"[10] determined that the board

---

[10] The Daugherty test is a series of seven questions used by labor arbitrators to determine whether good cause existed for terminating an employee. *Summit Cty. Children Servs.*

terminated Hiss on "disparate grounds" from Crabtree, who, according to Hiss and the common pleas court, committed similar misconduct but only received a written reprimand and a partial suspension of his coaching contract. And because the board treated Hiss differently from Crabtree, the court concluded that the board lacked good and just cause to terminate Hiss's contract.

{¶ 137} In reaching its decision, the common pleas court rejected the referee's explicit findings that the students who testified at the hearing were credible and that Hiss was not credible, calling the referee's credibility determination "defective." The common pleas court reasoned that the referee's determination was not entitled to due deference because the referee disregarded inconsistencies in the students' testimony and applied a "nonexistent standard" in deciding whether Hiss was credible. The court

---

*Bd. v. Communication Workers of Am., Local 4546*, 113 Ohio St.3d 291, 2007-Ohio-1949, 865 N.E.3d 31, ¶ 9, fn. 1. The questions in the Daugherty test are: "'1. Did the company give to the employee forewarning or foreknowledge of the possible or probabl[e] disciplinary consequences of the employee's conduct?' '2. Was the company's rule or managerial order reasonably related to (a) the orderly, efficient, and safe operation of the company's business and (b) the performance that the company might properly expect of the employee?' '3. Did the company, before administering discipline to an employee, make an effort to discover whether the employee did in fact violate or disobey a rule or order of management?' '4. Was the company's investigation conducted fairly and objectively?' '5. At the investigation did the "judge" obtain substantial evidence or proof that the employee was guilty as charged?' '6. Has the company applied its rules, orders, and penalties evenhandedly and without discrimination to all employees?' '7. Was the degree of discipline administered by the company in a particular case reasonably related to (a) the seriousness of the employee's proven offense and (b) the record of the employee in his service with the company?'" *Id.*, quoting *Ent. Wire Co.*, 46 Lab.Arb.Rep. 359, 363-364 (1966). A "no" answer to any one of the questions means that the employer did not have good cause. *Id.*

45.

concluded that the referee's report and recommendation were not supported by a preponderance of the evidence, the board's acceptance of the referee's report was contrary to law, the board's termination of Hiss's contract was not supported by substantial, credible evidence, and the board failed to establish good and just cause for Hiss's termination. Accordingly, the court granted Hiss's motion for summary judgment, denied the board's motion for summary judgment, and ordered the board to rescind its resolution terminating Hiss, reinstate Hiss to her teaching position with Perkins, and make Hiss whole for her losses related to the termination proceedings.

{¶ 138} On November 30, 2017, the common pleas court held a damages hearing to determine the amount of back pay and benefits to which Hiss was entitled. The court issued its damages award (from which the board appeals) on May 18, 2018.

### III.    Assignments of Error

{¶ 139} The board now appeals, raising six assignments of error:

I. The Common Pleas Court abused its discretion when it held that a teacher should not be terminated from employment for giving that teacher's prescription pain medications to students.

II. The Common Pleas Court erred as a matter of law in crafting new and additional due process standards far in excess of existing precedent.

III. The Common Pleas Court unreasonably usurped the fact-finding role of the Ohio Department of Education referee in the administrative

46.

teacher-termination proceeding by rejecting the referee's findings that the student-witnesses were credible and that Tracey Hiss was not credible.

IV. The Common Pleas Court erred as a matter of law in failing to apply the legal effect of the R.C. 3319.17 reduction in force to its damages calculations.

V. The Common Pleas Court erred as a matter of law in holding that Ms. Hiss' [sic] loss of her teaching license does not cut off her damages.

VI. The Common Pleas Court erred as a matter of law in ordering reinstatement of Ms. Hiss when she has no teaching license.

### IV. Law and Analysis

{¶ 140} The board's first three assignments of error challenge the common pleas court's determination that the board lacked "good and just cause" to terminate Hiss under R.C. 3319.16.

{¶ 141} Termination of a teacher's contract with a board of education is governed by R.C. 3319.16. Under the statute, the contract of any teacher employed by a board of education may not be terminated "except for good and just cause." *Id.* Before terminating a teacher's contract, "the employing board shall furnish the teacher a written notice signed by its treasurer of its intention to consider the termination of the teacher's contract with full specification of the grounds for such consideration." *Id.* The teacher may then file with the treasurer a written demand for a hearing before the board or before a referee. *Id.* Where the hearing is conducted by a referee, the referee must file a report

47.

within ten days after the hearing. *Id.* "After consideration of the referee's report, the board, by a majority vote, may accept or reject the referee's recommendation on the termination of the teacher's contract." *Id.* The order of termination must state the grounds for termination. *Id.*

{¶ 142} The Supreme Court of Ohio—applying an earlier iteration of R.C. 3319.16—explained in *Aldridge v. Huntington Local School Dist. Bd. of Edn.*, 38 Ohio St.3d 154, 157, 527 N.E.2d 291 (1988), that "[t]he decision to terminate a teacher's contract is comprised of two parts: (1) the factual basis for the allegations giving rise to the termination; and (2) the judgment as to whether the facts, as found, constitute [good and just] cause as defined by statute." The referee is primarily responsible for making findings of fact, but the school board has "the right and the responsibility to review those findings." *Id.* at 158. A school board must accept the referee's findings of fact unless they are "against the greater weight, or preponderance, of the evidence." *Id.* The board then has the discretion to accept or reject the recommendation of the referee "unless such acceptance or rejection is contrary to law." *Id.*

{¶ 143} After the board has rendered a decision to terminate a teacher's contract, the teacher may appeal the decision by filing an original action in the court of common pleas. R.C. 3319.16. "The court shall examine the transcript and record of the hearing and shall hold such additional hearings as it considers advisable, at which it may consider other evidence in addition to the transcript and record." *Id.* The common pleas court may then grant or deny the relief requested in the teacher's complaint. *Id.* In doing so,

48.

however, the common pleas court "'may only reverse the board's order of termination if it finds that the order is not supported by or is against the weight of the evidence.'" *Speller v. Toledo Pub. School Dist. Bd. of Edn.*, 2015-Ohio-2672, 38 N.E.3d 509, ¶ 21 (6th Dist.), quoting *Martin v. Bd. of Edn. of Bellevue City School Dist.*, 6th Dist. Huron No. H-12-002, 2013-Ohio-4420, ¶ 18. The common pleas court "cannot substitute its judgment for the judgment of the board where a fair administrative hearing is had and there is substantial and credible evidence in the record to support the board's decision." *Fox v. Bd. of Edn. of the Huron City School Dist.*, 6th Dist. Erie Nos. E-16-076 and E-16-077, 2017-Ohio-7984, ¶ 18. In other words, "[w]here the grounds for termination are established by the evidence, neither the common pleas court nor this court on appeal may substitute its judgment for the judgment of the administrative authority." *Kitchen v. Bd. of Edn. of Fairfield City School Dist.*, 12th Dist. Butler No. CA2006-09-234, 2007-Ohio-2846, ¶ 39. Further, "[a]bsent a claim that the school board violated a statutory right or constitutional obligation, a trial court may not substitute its judgment for that of the board." *Bertolini v. Whitehall City School Dist. Bd. of Edn.*, 139 Ohio App.3d 595, 604, 744 N.E.2d 1245 (10th Dist.2000).

{¶ 144} The teacher or the board may appeal the decision of the court of common pleas to a court of appeals. Our review of the lower court's decision is narrow: absent an abuse of discretion, we must affirm the common pleas court's decision. *Speller* at ¶ 43. Abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or

49.

unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610, 665 N.E.2d 200 (1996).

## A. The Common Pleas Court Abused its Discretion

{¶ 145} In its first assignment of error, the board argues that the common pleas court abused its discretion by finding that the board lacked "good and just cause" for terminating Hiss's teaching contract. Hiss responds that the common pleas court properly used the Daugherty test to determine that Hiss was terminated on disparate grounds, showing that the board lacked good and just cause for terminating her contract.

{¶ 146} In its second assignment of error, the board contends that the common pleas court erred as a matter of law by creating a due process "right to an adequate investigation." In response, Hiss argues that "[i]t is a fundamental concept of due process that, prior to termination, an employee is entitled to a fair and adequate investigation," and the common pleas court acted within its discretion in determining that Hiss did not receive the benefits of a full and fair investigation of her situation.

{¶ 147} And in its third assignment of error, the board argues that the common pleas court impermissibly disregarded the referee's credibility determinations, despite "substantial and credible" evidence that supported the referee's findings. Hiss, on the other hand, claims that the common pleas court properly exercised its discretion by not affording deference to the referee's credibility determinations and by finding that the referee's recommendation was not supported by substantial and credible evidence.

50.

{¶ 148} We address these assignments of error together. After a review of the record, we find that the common pleas court abused its discretion by applying the wrong standard for "good and just cause," by failing to defer to the referee's credibility findings, and by substituting its own judgment for the board's judgment.

## 1. Good and Just Cause

{¶ 149} "Good and just cause" is not defined by R.C. 3319.16, but the Supreme Court has defined it as involving a "fairly serious matter." *Hale v. Bd. of Edn., City of Lancaster*, 13 Ohio St.2d 92, 99, 234 N.E.2d 583 (1968). What constitutes "good and just cause" depends on the context and unique facts of each case. *Lanzo v. Campbell City School Dist. Bd. of Edn.*, 7th Dist. Mahoning No. 09 MA 154, 2010-Ohio-4779, ¶ 18.

{¶ 150} Although "good and just cause" is an imprecise concept, appellate courts have defined its broad outlines to include behavior that had or could have had a serious effect on the school system, *Winland v. Strasburg-Franklin Local School Dist. Bd. of Edn.*, 2013-Ohio-4670, 999 N.E.2d 1190, ¶ 39 (5th Dist.), citing *Bertolini*, 139 Ohio App.3d at 608, 744 N.E.2d 1245, and behavior that is "hostile to the school community." *Hykes v. Bellevue City School Dist. Bd. of Edn.*, 2012-Ohio-6059, 985 N.E.2d 218, ¶ 26 (6th Dist.), citing *Florian v. Highland Local School Dist. Bd. of Edn.*, 24 Ohio App.3d 41, 493 N.E.2d 249 (9th Dist.1983). Actions that could have caused serious harm to a student fall within the scope of good and just cause. *Bertolini* at 608, citing *Ricchetti v. Cleveland City School Dist. Bd. of Edn.*, 8th Dist. Cuyahoga No. 64833, 1994 WL 66227 (Mar. 3, 1994) (good and just cause found when a teacher with a child in his car engaged

51.

in a high-speed chase down a major city street in an attempt to avoid apprehension by police), and *Brownfield v. Warren Local School Dist. Bd. of Edn.*, 4th Dist. Washington No. 89 CA 26, 1990 WL 127054 (Aug. 28, 1990) (good and just cause found when a teacher risked the physical safety of a student by requiring the student to touch the end of a paper clip that the teacher placed into an electrical outlet); c*ompare Stalder v. St. Bernard-Elmwood Place City School Dist.*, 1st Dist. Hamilton No. C-090632, 2010-Ohio-2363 (no good and just cause found where teacher threw a basketball at the basketball in the hands of a student, but was not trying to hit the student with the basketball). Moreover, a series of acts of misconduct—as opposed to a single, isolated incident—taken together, can constitute a serious matter that rises to the level of good and just cause. *Kitchen*, 12th Dist. Butler No. CA2006-09-234, 2007-Ohio-2846, at ¶ 38.

{¶ 151} Here, we find that the common pleas court's reliance on the Daugherty test to define "good and just cause" was misplaced. Contrary to the court's finding, the Supreme Court of Ohio has not "adopted" the Daugherty test as a measure of good and just cause in teacher-contract-termination cases. Instead, in a labor-arbitration case arising under a CBA (i.e., *not* a termination proceeding under R.C. 3319.16), the Supreme Court acknowledged that an arbitrator *may* use the Daugherty test to determine if an employee was discharged with just cause, but expressly stated that it did not "suggest that it is the only proper definition [of just cause] or that parties to a CBA are required to use the Daugherty test." *Summit Cty. Children Servs. Bd.*, 113 Ohio St.3d 291, 2007-Ohio-1949, 865 N.E.2d 31, at ¶ 19.

52.

{¶ 152} Moreover, the Supreme Court went on to note that, in that case, it was reasonable for the arbitrator to look to the Daugherty test to supply meaning for "good cause" because it was undefined in the parties' CBA. *Id.* In contrast, "good and just cause" in a teacher-contract-termination case is not an undefined term. Although R.C. 3319.16 does not provide a definition, the case law does. Thus, the common pleas court exceeded its authority by relying on the Daugherty test (rather than R.C. 3319.16 cases) to determine whether there was good and just cause in this case.

{¶ 153} When considered under the proper standard, the evidence in the record amply supports the board's determination that good and just cause existed to terminate Hiss's contract. The board had a policy in effect since at least 2010 prohibiting anyone other than a school nurse or board designee from dispensing medicine to students, which could only be done with written permission from the student's parent. Additionally, beginning in the fall of 2012, all coaches were specifically prohibited from giving any medicine—prescription or OTC—to students. This policy was sent to all coaches— including Hiss—in an email and reiterated by Strohl at coaches' meetings. Hiss understood the board's policy to prohibit giving students medicine without getting a parent's permission first.

{¶ 154} When the school district's investigation was complete, eight students came forward saying that Hiss had provided them with some type of medicine at various times over a period of three years. Six of the students had received patches. Of those, four students—students 2, 3, 5, and 6 (the four students who both received patches and

53.

testified at the referee hearing)—identified the Lidoderm patches in evidence as the same type Hiss gave them, and two of the students—students 5 and 8—turned prescription Lidoderm patches over to the authorities. Hiss admitted to having the same type of prescription patches in her possession, although only for a period of four or five months in early 2013.

{¶ 155} Hiss's actions of either giving or allowing her students access to prescription analgesic patches over a period of three years is a "fairly serious matter" that falls squarely within the realm of good and just cause for termination, as applied in teacher-termination cases under R.C. 3319.16. First, it was a behavior that could have had a serious effect on the school district if one of the patches had caused harm to a student who used them. This could have occurred if a student had a reaction to the patches or further injured herself while using the patches. Second, giving or allowing students access to prescription drugs was against school district policy and was hostile to the school community, particularly if it was done to help the girls compete. *See Florian*, 24 Ohio App.3d at 42-43, 493 N.E.2d 249 (coach who instructed an athlete to engage in dishonest behavior to give another athlete an advantage engaged in conduct hostile to the school community). And finally, this was not an isolated incident. Rather, Hiss's situation involved eight students receiving medicine from Hiss in contravention of school board policy multiple times over three years. Taken together, these facts show that the board had good and just cause to terminate Hiss's contract under R.C. 3319.16.

54.

**{¶ 156}** Because the weight of the evidence supported the board's determination that there was "good and just cause" to terminate Hiss's teaching contract, the common pleas court abused its discretion by overturning the board's decision.

### 2. Resolution of Conflicting Testimony

**{¶ 157}** In addition to using the wrong standard for determining whether good and just cause existed, the common pleas court failed to defer to the referee's resolution of conflicting testimony. Although the common pleas court is permitted to weigh evidence and make factual findings in an R.C. 3319.16 appeal, *Graziano v. Bd. of Edn. of Amherst Exempted Village School Dist.*, 32 Ohio St.3d 289, 293, 513 N.E.2d 282 (1987), it is required to give due deference to the administrative resolution of evidentiary conflicts because, in a refereed hearing, it is the referee who sees and hears the witnesses testify and can best weigh their credibility. *Fox*, 6th Dist. Erie Nos. E-16-076 and E-16-077, 2017-Ohio-7984, at ¶ 20, citing *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 111, 407 N.E.2d 1265 (1980); *see also Elsass v. St. Marys City School Dist. Bd. of Edn.*, 3d Dist. Auglaize No. 2-10-30, 2011-Ohio-1870.

**{¶ 158}** The common pleas court in this case failed to give deference to the referee's resolution of conflicting evidence. The students and Hiss gave testimony about the patches that was often diametrically opposed. The referee resolved these conflicts in favor of the students, specifically finding that the students presented "credible testimony" that Hiss had given them patches and "very credible evidence" that Hiss told some of them not to tell anyone they had received patches from her. The referee also specifically

55.

found that Hiss's testimony was not credible (calling her testimony "incredible and disappointing"), she did not "offer much explanation" for why the students would have lied during the investigation and under oath at the hearing, and she failed to show that the board's witnesses were biased against her.

{¶ 159} The common pleas court, on the other hand—based only on the transcript of the referee hearing—discounted all of the students' testimony and found Hiss wholly credible, even though the it was the referee—not the common pleas court—who saw the students and Hiss testify. Instead, the common pleas court chose to interpret the significance of the testimony differently (i.e., substitute its judgment for the board's judgment). For example, the common pleas court found, without any supporting testimony from the students, that it was reasonable for the students who had patches to believe that they might be in some type of trouble when the police became involved with the situation, thus it was "logical" for the students "to conclude that it was better to 'get ahead' of the situation by directing attention back to Ms. Hiss * * *." As another example, the common pleas court concluded that student 1 had motive to "tell a story deviating from her testimony" because her uncle, the boys' track coach, wanted Hiss's job as the girls' track coach. The common pleas court based this conclusion on Strohl's testimony that the uncle "offered" to oversee both the boys' and girls' track programs after Hiss was suspended and student 1's testimony that her father thought highly of her uncle as a coach. The court then apparently disregarded student 1's denial that her

56.

uncle's inability to coach her was the reason she did not participate in track her freshman year, instead blaming an injury that she sustained during basketball season.

{¶ 160} Because the common pleas court gave no deference to the referee's resolution of evidentiary conflicts, we find that it abused its discretion in overturning the board's decision.

### 3. Substitution of Judgment

{¶ 161} Finally, we find that the common pleas court improperly substituted its own judgment for the judgment of the board.

{¶ 162} A common pleas court "cannot substitute its judgment for the judgment of the board where a fair administrative hearing is had and there is substantial and credible evidence in the record to support the board's decision." *Fox*, 6th Dist. Erie Nos. E-16-076 and E-16-077, 2017-Ohio-7984, at ¶ 18. A "fair administrative hearing" is had when a board of education complies with R.C. 3319.16 and affords a teacher the due process to which she is entitled. *See Spitulski v. Bd. of Edn. of the Toledo City School Dist.*, 2018-Ohio-3984, 121 N.E.3d 41, ¶ 95-96 (6th Dist.).

{¶ 163} Due process rights in a teacher-termination case are limited to "notice and an opportunity to be heard * * *." *Dorian v. Euclid Bd. of Edn.*, 62 Ohio St.2d 182, 185, 404 N.E.2d 155 (1980). Indeed, "[t]he purpose of R.C. 3319.16, [sic] is to provide the essential requirements of due process: notice and an opportunity to respond." *Speller*, 2015-Ohio-2672, 38 N.E.3d 509, at ¶ 26, citing *Badertscher v. Liberty-Benton School Dist. Bd. of Edn.*, 2015-Ohio-1422, 29 N.E.3d 1034 (3d Dist.). To that end, R.C. 3319.16

requires a school board to provide notice that includes "full specification" of the grounds for a teacher's termination, allows the teacher to elect a hearing before the board or a referee, and restricts the hearing to the matters specified in the notice. When a teacher is fully apprised of the accusations against her at every stage of the proceedings and is able to respond to those accusations at every stage, the school board does not run afoul of the teacher's due process rights. *See, e.g., Speller* (administrator received due process protections when she knew her behavior was against policy because she was previously disciplined for behavior that formed the grounds for termination and fully participated in the hearing before a referee); *Badertscher* ("the overall record from the outset overwhelmingly reflect[ed]" that the teacher knew a specific incident was the basis for the board's termination proceedings and was able to respond to the board's accusations, despite the board's failure to specifically label its reference to the incident as one of the grounds for termination); *Beranek v. Martins Ferry City School Dist. Bd. of Edn.*, 7th Dist. Belmont No. 88-B-11, 1989 WL 3929, *7 (Jan. 20, 1989) (although the board's initial specification of the grounds for termination was vague, the teacher was given "full specifications of all charges" before the hearing and "did not appear at the referee's hearing without any foreknowledge of the specifics of the charges filed against him.").

{¶ 164} Here, Hiss was afforded all of the due process to which she was entitled. That is, she received notice of the charges against her and was given several meaningful opportunities to respond to the charges. Contrary to the common pleas court's findings, the specifications in the board's notice to Hiss were not "so vague as to be indefensible *

58.

* *." Hiss was told at every stage of the process what she was accused of doing (i.e., giving prescription pain patches to students) and was told when, to the best of the school district's knowledge, she was alleged to have done so. She was also represented by competent counsel, fully participated in the referee hearing, presented evidence, questioned witnesses, presented witnesses to counter the board's allegations, and overall "did not appear at the referee's hearing without any foreknowledge of the specifics of the charges filed against [her]." *Beranek* at *7. Under these circumstances, we cannot say that Hiss was unaware of the specifics of the board's charges. *See Spitulski* at ¶ 95-96.

{¶ 165} Hiss was also given three separate opportunities to respond to the charges. The first was at the prediscipline conference with Gunner on May 14, 2013. The recording of the conference showed that Hiss was informed about the charges at the conference, gave her response to the accusations, and had the assistance of a union representative. Even assuming that the first prediscipline conference was insufficient, Hiss had a second opportunity to respond to the charges against her at the March 31, 2014 prediscipline conference. At that point, she had received the first notice of intent from Gunner, so she was fully aware of what the district was charging her with, and she had the assistance of a union representative at the conference. Further, Hiss had a third chance to address the charges against her at the referee hearing, where she was represented by counsel and fully participated. Again, under these circumstances, we cannot say that Hiss's due process rights to notice and an opportunity to be heard were violated.

59.

**{¶ 166}** Finally, we disagree with the common pleas court's conclusion that Hiss had a due process right to a "full and fair investigation." Rather, the Supreme Court of Ohio has recognized a teacher's due process rights in an R.C. 3319.16 case as the rights of "notice and an opportunity to be heard * * *." *Dorian*, 62 Ohio St.2d at 185-186, 404 N.E.2d 155. Hiss's rights to notice and an opportunity to be heard were honored in this case.

**{¶ 167}** Thus, because Hiss received a fair hearing and, as discussed above, there is substantial and credible evidence supporting the board's decision to terminate Hiss's contract, the common pleas court could not properly substitute its judgment for that of the board. Accordingly, we find that the common pleas court abused its discretion by substituting its judgment in place of the board's judgment.

**{¶ 168}** The board's first, second, and third assignments of error are well-taken.

### B. Remaining Assignments of Error

**{¶ 169}** Because we have determined that the common pleas court erred by overturning the board's decision to terminate Hiss's contract, we find that the board's fourth, fifth, and sixth assignments of error are moot and are not well-taken.

### V.     Conclusion

**{¶ 170}** Based on the foregoing, the May 18, 2018 judgment of the Erie County Court of Common Pleas is reversed and vacated. The board's March 11, 2015 decision

60.

to terminate Hiss's teaching contract is reinstated.  Hiss is ordered to pay the costs of this

appeal pursuant to App.R. 24.

Judgment reversed and vacated.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.           
_____
                                  JUDGE

Christine E. Mayle, P.J.      

_____

Gene A. Zmuda, J.             
                                  JUDGE
CONCUR.

_____
                                  JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.